UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

FEDERAL TRADE COMMISSION,

        Plaintiff,

      - against -

MEDICAL BILLERS NETWORK, INC., et al., :

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:  3/31/08
```

05 Civ. 2014 (RJH)

**MEMORANDUM ORDER
AND OPINION**

This is an action brought by the Federal Trade Commission ("FTC") against

defendants Medical Billers Network ("MBN"), Chris Taylor ("Taylor"), Caceres Quality

Distribution, Inc. ("CQD"), Wilson Jose Caceres ("Caceres") (collectively "Defendants")

and relief defendant Knarek Kalantaryan ("Kalantaryan") for allegedly deceptive

representations regarding "work-at-home medical billing opportunities" promoted and

sold by Defendants. The FTC alleges that Defendants' advertising and sales practices

violated Section 5(a) of the Federal Trade Commission Act (the "FTC Act"), 15 U.S.C.

§ 45(a), and the Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310.

The FTC's Amended Complaint includes four causes of action. Counts I and II

assert violations of Section 5(a) of the FTC Act based on Defendants' alleged

misrepresentations that purchasers of the MBN medical billing opportunity (the "MBN

Program") were "likely to earn a substantial income" (Count I) (Am. Compl. ¶ 17) and

that purchasers would receive information regarding physicians who were likely to use

the purchasers for medical billing (Count II) (*id.* at ¶ 20). Counts III and IV assert

violations of the TSR based on Defendants' alleged misrepresentations regarding "material aspects" of the MBN Program (Count III) (*id.* at ¶ 28) and Defendants' failure to disclose MBN's no-refund policy to purchasers prior to payment (Count IV) (*id.* at ¶ 29).

The FTC and defendants Taylor and MBN (the "Taylor Defendants") have filed cross-motions for summary judgment. The Court's review of the record, guided by the parties' Rule 56.1 statements and responses, shows that the following facts are both undisputed and adequately supported by evidence the Court may consider in connection with a motion for summary judgment.[1]

## FACTS

### I. Parties and Background

MBN and CQD promoted and sold work-at-home medical billing opportunities. (Pl.'s Rule 56.1 Statement of Material Facts Not in Dispute on Mot. for Summ. J. ("FTC Facts") ¶¶ 10, 11.) Taylor is the president, chief executive officer, sole director, and sole shareholder of MBN, and the registrant of MBN's website. (*Id.* at ¶¶ 4, 12, 14, 15, 16; Taylor Defs.' Statement of Material Facts in Dispute in Resp. to Pl.'s Mot. for Summ. J. ("Taylor Defs.' Disputed Facts")[2] ¶ 21.)

Taylor was the designer and draftsman of the MBN program and the materials used by MBN to market the program to the public. (Taylor Defs.' Disputed Facts ¶ 22.)

---

[1] The Court's review and assessment of Defendants' evidence was made considerably and unnecessarily more difficult by Defendants' repeated use of incorrect exhibit numbers in their citations, failure to tab or otherwise separate exhibits, failure to provide the Court with copies of all exhibits, and failure to provide deposition transcripts with visible page numbers.

[2] "Taylor Defendants' Statement of Material Facts in Dispute in Response to Plaintiff's Motion for Summary Judgment" can be found at pages 16–29 of the Taylor Defendants' submission entitled "Statement of Defendants Medical Billers Network, Inc. and Chris Taylor Pursuant to Local Rule 56.1."

The program and materials were a result of extensive research and analysis, including research regarding laws governing medical billing and research regarding the "laws and facts" surrounding prior FTC actions against medical billing companies and other companies that sold business opportunities. (*Id.* at ¶¶ 33, 34, 42, 44, 91.) Taylor also researched the earnings potential of medical billers by consulting available statistics and people familiar with the industry. (*Id.* at ¶¶ 43, 69, 70, 71, 72, 81, 82, 87.) Taylor concluded from his research that the Health Insurance Portability and Accountability Act ("HIPAA") made it beneficial for a physician to file Medicare claims electronically and that any provider still filing paper claims would be motivated to do so. (*Id.* at ¶ 70.) Taylor believed and continues to believe that all of MBN's practices were legal. (*Id.* at ¶¶ 31, 45, 46, 86.)

Since at least 2001, Defendants offered and sold medical billing employment opportunities to consumers. (Caceres Resp. to Pl.'s Rule 56.1 Statement ("Caceres Resp.") ¶ 25; Am. Answer ¶ 6.) In 2002, Caceres was hired by Taylor to sell the MBN Program. (Caceres Resp. ¶ 19.) Later, in 2002 or 2003, Caceres started a corporation named CQD; Taylor and MBN contracted with CQD to handle telemarketing for the MBN Program. (*Id.* at ¶¶ 6, 97; Taylor Defs.' Resp. to Pl.'s Statement of Material Facts Not in Dispute in Supp. of Plaintiff's Mot. for Summ. J. ("Taylor Defs.' Resp.")[3] ¶ 99; FTC Exs. in Supp. of Mot. for Summ. J. ("FTJ SJ") Ex. 1 at 263:23–266:2; Aff. of Daniel A. Zimmerman, May 25, 2007 ("Zimmerman Aff.") Ex. 94 at 52:3–53:11.) Caceres was the president, secretary, treasurer, sole director, and principal owner of CQD. (FTC Facts

---

[3] "Taylor Defendants' Response to Plaintiff's Statement of Material Facts Not in Dispute in Support of Plaintiff's Motion for Summary Judgment" can be found at pages 2–16 of the Taylor Defendants' submission entitled "Statement of Defendants Medical Billers Network, Inc. and Chris Taylor Pursuant to Local Rule 56.1."

¶¶ 13, 20; Caceres Resp. ¶¶ 13, 20; FTC Exs. in Supp. of TRO ("FTC TRO") Ex. 1 Att. B 7–8.) He used his own credit cards to provide startup capital for the company and was actively involved in its day-to-day operation. (Caceres Resp. ¶¶ 13, 100, 101.)[4] CQD was listed on purchasers' credit card statements as the entity that was paid for the purchase of the MBN Program. (*Id.* at ¶ 22.)

Caceres characterized his business relationship with Taylor by saying "it was [Taylor's] program and . . . verbiage and my job [] to sell it." (FTC Facts ¶ 99.) Caceres's role in the MBN-CQD relationship was to advertise and market the MBN Program, generate leads, and pay for customer service and phone bills. (*Id.* at ¶¶ 98, 99.) He also hired commissioned salespeople to do telemarketing for CQD. (*Id.* at ¶ 103.) Taylor occasionally asked Caceres to hire employees for CQD. (*Id.* at ¶ 102.)

CQD paid MBN between \$25 and \$40 for each sale. (*Id.* at ¶¶ 118, 125.) Payments were made by electronic transfer directly into the personal checking account of relief defendant Kalantaryan, Taylor's wife. (*Id.* at ¶ 124.) Kalantaryan withdrew approximately \$6,500 each month from this account as her MBN salary. (*Id.* at ¶¶ 126–127.)

In January 2005, Caceres and Taylor decided to change the name of MBN to United Career System ("UCS") because they believed UCS was a "better name." (Zimmerman Aff. Ex. 94 at 196:15–200:25; FTC Facts ¶¶ 72–75.[5]) While technically

---

[4] Caceres maintains that he cut ties with CQD and left the medical billing industry in late March or early April of 2005. (Caceres Resp. ¶ 34.) However, a letter from Caceres to FTC attorney Ronald Waldman dated September 3, 2005 describes Caceres's continuing active involvement with MBN and/or CQD. (FTC SJ Ex. 5.)

[5] The Taylor Defendants purport to dispute this fact, asserting that the evidence cited by the FTC does not support its assertion and citing Exhibit 58t and pages 320–22 of Taylor's deposition. The Caceres deposition testimony cited by the FTC clearly supports the statement. Furthermore, the Taylor Defendants have provided no exhibit numbered 58t, and the cited pages of Taylor's deposition either do not exist or

4

UCS was a d/b/a filed by Caceres on behalf of himself (Second Aff. of Christopher Taylor Identifying Exs. ("Second Taylor Aff.") Ex. 76; Taylor Defs.' Resp. ¶ 72), UCS was not a distinct corporate entity—it was the exact same business as MBN and used essentially the same sales script that was used to telemarket under the MBN name. (FTC Facts ¶¶ 72–74; Zimmerman Aff. Ex. 94 at 196:15–200:22, 206:18–23, 208:2–210:4; FTC SJ Ex. 2 at Pl.'s Ex. 2, Ex. 2 at Pl.'s Ex. 6.)

Taylor testified that all sales representatives were required to sign a Compliance Agreement[6] which, *inter alia*, instructed them not to guarantee that purchasers would have success using the MBN program. (Taylor Defs.' Disputed Facts ¶¶ 93–96; Zimmerman Aff. Ex. 92 at 128:11–137:17.) He also testified that, on or before March 11, 2003, he created additional compliance guidelines that sales representatives were required to sign; these guidelines, *inter alia*, instructed sales representatives not to make earnings representations to consumers using specific dollar amounts. (Taylor Defs.' Disputed Facts ¶ 100; Zimmerman Aff. Ex. 92 at 169:14–179:2.) Taylor states that he intended the guidelines in these documents to comply with the laws governing telemarketing. (Taylor Defs.' Disputed Facts ¶ 101.) The contract between Caceres and Taylor specified that Caceres was also required to follow these compliance guidelines and was not to make any changes to the sales script or rebuttals without Taylor's approval. (*Id.* at ¶ 102; Zimmerman Aff. Ex. 92 at 177:13–178:20.)

---

have not been provided. The Taylor Defendants have not successfully established that this fact is in dispute.

[6] The Taylor Defendants state that the Compliance Agreement appears at Exhibit 10. However, there is no Exhibit 10 accompanying the Taylor Defendants' summary judgment papers. It appears that the Compliance Agreement is included as Exhibit 51 to the Taylor Defendants summary judgment papers. (*See* First Aff. of Christopher Taylor, May 23, 2007 ("First Taylor Aff.") ¶ 53, Second Taylor Aff. Ex. 51.)

Taylor conferred with customer service lead David Arnold regarding Better Business Bureau complaints to determine whether any particular CQD sales representative was violating the Compliance Agreement, but never identified any such individual. (Taylor Defs.' Disputed Facts ¶ 97; Zimmerman Aff. Ex. 92 at 127:3–130:3, 137:18–138:21.) Before CQD took over as the telemarketer for MBN, Taylor had spoken to one sales representative who had been named in two BBB complaints and informed this representative that he would be terminated if he did not adhere to the Compliance Agreement. (Taylor Defs.' Disputed Facts ¶ 98; Zimmerman Aff. Ex. 92 at 140:16–142:4.)

Taylor has testified that, after CQD took over telemarketing for MBN, approximately 20,000 sales of the MBN Program were made for prices ranging from $199 to $299. (FTC Facts ¶ 117.) In 2003, CQD totaled $2,030,018 in sales. (*Id.* at ¶ 122.) From MBN, Taylor earned $32,800 in 2001, $261,580 in 2002, $250,020 in 2003, and $220,420 in 2004. (*Id.* at ¶¶ 119–121, 123.)

## II.  Defendants' Representations

### A.  Earnings representations in print advertisements

Defendants typically promoted the MBN Program in classified advertisements in newspapers and other publications. (*Id.* at ¶ 26; Am. Answer ¶ 6.) The advertisements stated that consumers could earn significant income working at home processing medical claims and urged consumers to call the listed toll-free telephone number to learn more about the opportunity. (FTC Facts ¶¶ 48–50; Am. Answer ¶ 6.)[7] A representative

---

[7] The Taylor Defendants now purport to dispute the FTC's assertion that "[i]n numerous instances, Defendants' classified ads indicated that consumers can earn significant income." (FTC Facts ¶ 50; Taylor

6

advertisement from October 2004 read: "DATA ENTRY Work from home. Flexible Hours! $$$ Great Pay! $$$. Personal Computer required. 1-800-913-2823 x-100." (FTC Facts ¶ 27.) While with CQD, Caceres created advertising copy for the MBN Program and placed ads like these in newspapers. (FTC Facts ¶¶ 29–30.) CQD placed advertisements in many states nationwide. (*Id.* at ¶ 28.)

During 2004, CQD ran ads that stated "DATA ENTRY Could Earn $50,000/yr. . . . Great Pay! . . ." (Caceres Resp. ¶ 31; Taylor Defs.' Resp. ¶ 25, FTC SJ Ex. 5.) Defendants dispute the length of time for which the "$50,000/yr." ads ran, but all defendants apparently concede that they ran for at least ten days.[8] Caceres states that he believed in good faith that these ads were true and promptly discontinued the ads after being informed that they could not state a specific dollar amount. (Caceres Resp. ¶ 31.)

## B. Earnings representations by telemarketers

Consumers who called the toll-free number listed in Defendants' advertisements and spoke with Defendants' salespeople were told that, for a price of between approximately $200 and $295, they would receive what they needed to get started in medical billing, including electronic medical billing training, customer support and assistance, and necessary software to do electronic billing for physicians in the consumer's local area. (FTC Facts ¶¶ 52–54;[9] Am. Answer ¶ 7.)

---

Defs.' Resp. ¶ 50.) However, Defendants previously admitted this fact in their Answer to the FTC's Amended Complaint. (Am. Answer ¶ 6.)

[8] Caceres claims, without citation to supporting evidence, that these ads ran for only "about ten days." (Caceres Resp. ¶ 31.) Confirmation letters from Advertising Connection, the company that placed the ads, indicate that they ran for fifteen weeks. (FTC Facts ¶¶ 128–129, FTC SJ Ex. 8.) Previously, in a September 3, 2005 letter to the FTC's counsel, Caceres stated that these ads ran for three weeks. (FTC SJ Ex. 5.)

[9] The Taylor Defendants now purport to dispute the FTC's assertion that "[c]onsumers who call Defendants are told that they will receive the software necessary to do electronic billing for physicians in the

Taylor wrote the original sales script used to market the MBN Program to consumers. (FTC Facts ¶ 55.) Taylor testified that minor changes were made to the sales scripts over time, but that the verbiage on important points remained the same. (Ex. in Supp. of Pl.'s Reply Mem. at 108:4–109:8.) A sales script used by MBN indicated that "an average biller can process 5–15 claims per hour and an average doctor generates about 100 claims per week. . . . All you have to do is join Medical Billers Network and agree to process your claims through our network clearinghouse." (FTC Facts ¶ 130; FTC SJ Ex. 2 at Pl.'s Ex. 1.) When Taylor himself telemarketed for MBN, he told callers who asked how much money they could earn using the MBN Program that the average doctor generates around one hundred claims per week and that the industry standard was to pay between three and ten dollars per claim. (FTC Facts ¶ 43; Zimmerman Aff. Ex. 92 at 105:11–107:23.)

As a telemarketer for MBN, Caceres read from Taylor's sales scripts, including a script of "Commonly Asked Questions." (FTC Facts ¶¶ 44–46.) The Commonly Asked Questions script included a representation that "working part-time, with one doctor, a biller processes an average of 80 to 120 claims per week. A biller makes an average of five dollars per claim, paid directly by the doctor, on a biweekly basis, $400–600 per week." (*Id.* at ¶¶ 45–46; FTC SJ Ex. 2 at Pl.'s Ex. 2.)

The UCS sales script also contained the representation that "[i]ndividual results will vary based on typing speed, but an average biller can process five to fifteen claims per hour and the current industry standard is three to five dollars per claim." (FTC Facts ¶ 76; FTC SJ Ex. 2 at Pl.'s Ex. 6.)

---

consumer's local area." (FTC Facts ¶ 54; Taylor Defs.' Resp. ¶ 54.) However, Defendants previously admitted this fact in their Answer to the FTC's Amended Complaint. (Am. Answer ¶ 6.)

8

FTC investigator Robert Cancellaro submitted a declaration dated February 9, 2005 indicating that an MBN salesperson left a message on his answering machine that stated, "You make an average of about $400 to $600 per week" using the MBN Program. (FTC TRO Ex. 1 at ¶ 12, Ex. 1 at Att. H.) Cancellaro submitted another declaration dated September 30, 2005 which states that, in March 2005, two UCS salespersons represented to him that Medicare had given UCS a list of doctors who, due to new regulations, were "now required to input a lot of new information into their computer systems" and that there was money to be made processing these doctors' claims electronically. (FTC Facts ¶ 131; Decl. of Robert Cancellaro, Sept. 30, 2005 ("Sept. 2005 Cancellaro Decl.") ¶¶ 5, 11.) According to Cancellaro, one representative stated that the average person makes approximately three to five dollars per claim and processes approximately one hundred claims in ten to fifteen hours (Sept. 2005 Cancellaro Decl. ¶ 6), and the other stated that the average person makes five dollars per claims and processes five to fifteen claims per hour (*id.* at ¶ 12).

Six purchasers submitted sworn declarations stating that Defendants' salespeople made representations indicating that purchasers would earn or could expect to earn $500 per week (FTC TRO Ex. 2, Ex. 3, Ex. 14, Ex. 16, Ex. 20) or more (*id.* Ex. 3, Ex. 12, Ex. 14). (FTC Facts ¶¶ 32–33.) Five other purchasers submitted declarations reporting similar representations regarding earnings. (FTC TRO Ex. 4 ¶ 6 (describing representation that "in a very short period of time [declarant] would be processing medical claims from home and making a good income"), Ex. 6 ¶ 4 (describing representation that purchaser could make $500 in a 20 hour work week), Ex. 9 ¶ 6 (describing representation that purchaser could make "a good deal of money" using the

9

MBN Program and could process 100–120 claims at $5 each per week), Ex. 13 ¶ 6 (describing representation that "it was very easy to make a lot of money from home"), Ex. 15 ¶¶ 5, 7 (describing representation of two MBN representatives that they were earning $500 per week using the MBN Program)).[10]

## C. Representations by telemarketers regarding physician leads

The MBN sales script instructed salespersons to tell consumers that "Medicare has just provided us a list of over 150,000 doctors who are still filing their insurance claims on paper. We are in the process of converting these doctors to electronic filing so they will be in compliance with the new Medicare requirements." (FTC Facts ¶ 58; FTC SJ Ex. 2 at 29:5–31:21, Ex. 2 at Pl.'s Ex. 1.)[11] The UCS sales script changed this wording slightly to "Medicare has provided us with a list of over 100,000 doctors nationwide who are still filing their claims on paper. Our program is designed to bring these doctors into compliance with the new Medicare requirements." (FTC SJ Ex. 2 at Pl.'s Ex. 6.)

Eighteen purchasers of the MBN Program have submitted declarations stating that Defendants' salespersons represented that, after the purchaser completed training, he or she would be either provided with medical bills to process, "set up" with at least one physician-client, and/or provided with access to a list of physicians in need of a medical biller. (FTC Facts ¶ 62; FTC TRO Exs. 2–7, Exs. 9–20.) For example, one purchaser

---

[10] The Taylor Defendants maintain that any "specific earnings representations," such as the $500/week representation, were made by CQD telemarketers in disregard of the MBN guidelines. (Taylor Defs.' Resp. ¶ 32.) The Taylor Defendants claim they are responsible only for the representations in the MBN sales script and sales training materials. (*Id.*)

[11] The sales script also included a "Rebuttals" section that included suggested responses to the following questions: Q: "How do I get the doctors?" A: "[MBN] will assist you in getting set up with doctor contacts." (FTC SJ Ex. 2 at Pl.'s Ex. 2.) Q: "So you give me the doctor?" A: "[W]e have a biller placement department that will assist you in getting set up with doctor contacts after you complete the training." (*Id.*)

claims she was told that "medical billers were in great demand in [her] area and employment was guaranteed." (*Id.* Ex. 20 ¶ 6.) Another said that the representative told him that MBN "knew of doctors in [his] area who needed medical billing services, doctors who were waiting for [him] to start working." (*Id.* Ex. 14 ¶ 7.) Another claims she was told that her "only responsibility would be to pick up the work at the doctors' offices and mail it back upon completion." (*Id.* Ex. 5 ¶ 6.)

Cancellaro's September 30, 2005 declaration states that he told two UCS salespersons that he was worried about "cold calling" physicians and was told in response that the doctors were "pre-screened" by Medicare and/or UCS. (Sept. 2005 Cancellaro Decl. ¶¶ 8, 14.) One representative told him that because the doctors were pre-screened, they would be willing to work with him; another told him that due to the prescreening he would not be making "cold calls." (*Id.*)

## D. Disclosure in the MBN registration agreement

Before accessing or downloading training materials, purchasers were required to agree to a Registration Agreement, which includes, *inter alia*, the following provisions:

> #1. I understand that my lifetime membership in MEDICAL BILLERS NETWORK entitles me to all the privileges of membership including: Free medical billing software and free software upgrades. Free training through online training modules. Free access to an online database of non-electronic physicians. Free online technical support and marketing assistance.
> . . . .
>
> #4. I understand that MEDICAL BILLERS NETWORK is not an employment agency, nor do I work directly for MEDICAL BILLERS NETWORK. I understand that as a member I am entitled access to online databases of physicians who have been identified by Medicare as filing their claims on paper, as well as extensive marketing tools and information to help me secure contracts with those physicians. I acknowledge that completing the training is my responsibility and upon completion of the

training I am entitled to assistance from MEDICAL BILLERS
NETWORK in locating doctors who can benefit from my services. I
understand and accept that MEDICAL BILLERS NETWORK cannot
guarantee my success and that my success as a medical biller is ultimately
dependent on my own ability to complete the training, perform the work
correctly and present and conduct myself professionally.

#5. I understand that upon acceptance of the terms of this agreement,
MEDICAL BILLERS NETWORK will process my registration and give
me access to the remaining training modules and the software download.

I understand that this is proprietary information and it is the exclusive
property of MEDICAL BILLERS NETWORK, licensed solely for use by
members. Any reproduction or distribution of the software or training
materials to any non-member is a violation of the terms of this agreement
and copyright law. Any violations of the license agreement will result in
immediate cancellation of membership privileges as well as civil [and/or]
criminal prosecution.

I understand and accept that once final access has been released to me,
there is no way for MEDICAL BILLERS NETWORK to confirm a return
of all copies of training materials and software the user might have made.
For this reason, we cannot authorize any cancellations of membership
following the release of final access. . . .

I understand and agree to all of the above-mentioned terms.

(*See* Taylor Defs.' Disputed Facts ¶¶ 47–53, 73; Second Taylor Aff. Ex. 12.) CQD and

MBN are both parties to the Membership Agreement. (Caceres Resp. ¶ 23.)

The MBN website was set up in such a way that all purchasers were required to

accept the terms of the Registration Agreement in order to "take final delivery" and

"complete their purchase" of the MBN Program materials. (Taylor Defs.' Disputed Facts

¶¶ 66, 68.) While the parties dispute whether or not acceptance of the Registration

Agreement preceded "payment," neither the FTC nor any defendant has cited any

evidence indicating at what point during the transaction purchasers' credit cards were

actually charged for the MBN Program. (*See, e.g., id.* at ¶ 103; FTC Resp. to Taylor

Defs.' Disputed Facts ("FTC Resp.") ¶ 103.)

12

## III. Consumer experience using the MBN Program

### A. Purchasers' earnings

The FTC submitted the declarations of twenty purchasers who claim to have earned no income using the MBN Program. (FTC Facts ¶ 51; FTC TRO Exs. 2–20, Ex. 23.) Defendants point out, however, that all but two of these twenty individuals never attempted to contact any doctors or to market their services to physicians, and that many did not even successfully access the MBN Program materials. (Taylor Defs.' Opp'n Br. 21–39.) Defendants have submitted declarations from four purchasers who report that they successfully contracted with physicians, charged between $2.50 and $8.00 per claim, and processed a sufficient number of claims to earn income from medical billing in amounts ranging from approximately $95 to $2400 per week.[12] (Second Taylor Aff. Ex. 30.)

Taylor had no oral or electronic communications with purchasers regarding whether they had earned money from the program, but claims that he had "actual knowledge" that purchasers were succeeding. (FTC Facts ¶¶ 70–71.) Defendants' claims regarding purchasers' success in contracting with doctors are based in part on communications from purchasers indicating, for example, that they had contracted with doctors to do electronic billing. (*See, e.g.,* Second Taylor Aff. Ex. 6, Exs. 36–41; Zimmerman Aff. Ex. 94 at 47:11–48:1; FTC SJ Ex. 1 at 281:15–283:21; Taylor Defs.'

---

[12] Cheryl Peacock declared that she charges $5 per claim, earns approximately $400 per week billing for two clients. (Second Taylor Aff. Ex. 30.) Debra Chase declared that she charges $2.50 or $3.50 per claim and earns approximately $1700 per month billing for three clients. (*Id.*) Janice Thomas declared that she charges $8 per claim and processes an average of between 100 and 300 claims per week billing for one client. (*Id.*) Charlton declared that she charges $5 per claim and earned approximately $370 per month billing for one client. (*Id.*)

13

Statement of Material Facts Not in Dispute in Supp. of Taylor Defs.' Cross Mot. For

Summ. J. ("Taylor Defs.' Facts")[13] ¶¶ 12, 35, 36; Caceres Resp. ¶ 69.) [14]

## B.    Physician contacts provided to purchasers

In fact, Defendants did not "set up" purchasers with physicians or provide

purchasers with information about physicians who had specifically expressed an interest

in hiring MBN Program members. (FTC Facts ¶ 63.) Instead, Defendants provided

access to two lists of physicians. The first was a list obtained from Medicare in response

to a Freedom of Information Act ("FOIA") request (the "Medicare List"). (*See*

Zimmerman Aff. Ex. 92 at 84:20–86:4.) This list included the names and locations of

approximately 150,000 physicians' offices that were, at that time, not submitting

Medicare claims electronically. (*See* Taylor Defs.' Disputed Facts ¶¶ 3, 33; Zimmerman

Aff. Ex. 92 at 84:20–86:4.)

The second list provided to MBN purchasers was a list of physicians' offices that

had been contacted and surveyed by MBN's marketing department (the "Surveyed List").

(FTC Facts ¶ 104; Taylor Defs.' Facts ¶ 4; Second Taylor Aff. Ex. 5; Zimmerman Aff.

---

[13] "Taylor Defendants' Statement of Material Facts Not in Dispute in Support of Taylor Defendants' Cross Motion for Summary Judgment" can be found at pages 30–34 of the Taylor Defendants' submission entitled "Statement of Defendants Medical Billers Network, Inc. and Chris Taylor Pursuant to Local Rule 56.1."

[14] These communications are inadmissible hearsay for the purpose of showing that purchasers were in fact able to enter into contracts with doctors and the Court cannot consider them. The Taylor Defendants also cite to a number of emails allegedly sent by MBN purchasers indicating that they successfully contracted with providers who would use their electronic billing services. (*See, e.g.,* Second Taylor Aff. Ex. 6, Ex. 57.) The FTC correctly objects to these emails as hearsay. (*See, e.g.,* FTC Resp. ¶¶ 12, 54.) Likewise, the statements in the declarations of David Arnold, Christa Merrill, Sue Moore, and Chris Taylor that they received emails from MBN purchasers reporting that they had successfully contracted with physicians are based on hearsay, not personal knowledge, and are inadmissible. (*See* Second Taylor Aff. Ex. 36, Ex. 38, Ex. 40, Ex. 41); Fed. R. Civ. P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge. . . ."); *see also Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir. 1988) ("Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge, and a hearsay affidavit is not a substitute for the personal knowledge of a party. . . .") (internal citation omitted). The purchaser emails and statements of Defendants' employees based on the content of these emails will not be considered by the Court as evidence that purchasers actually contracted with providers.

Ex. 93 at 75:16–80:4.) Using the Surveyed List, purchasers were able to view the responses of each surveyed office to the MBN survey questions. (FTC Facts ¶ 104; Taylor Defs.' Facts ¶ 4; Second Taylor Aff. Ex. 5; Zimmerman Aff. Ex. 93 at 75:16–80:4.)

The surveys were conducted by Susan Kichline, who was hired by Taylor to do marketing and doctor surveys for MBN.[15] (FTC Facts ¶ 104; Taylor Defs.' Facts ¶ 4; Zimmerman Aff. Ex. 93 at 75:16–80:4.) Taylor trained Kichline to conduct these surveys—he told her which doctors to call and prepared the script that Kichline followed. (FTC Facts ¶¶ 105–107; FTC SJ Ex. 3 at Pl.'s Ex. 4.) Per Taylor's instructions and survey script, Kichline told doctors she was calling from the "Medicare Information Center." (FTC Facts ¶¶ 109–111.) She represented that the Medicare Information Center was "currently assisting Medicare in their nationwide campaign to convert doctors to electronic filing." (*Id.* at ¶ 112.) In fact, Medicare Information Center was simply a "business name" used for the purpose of conducting these surveys and was not affiliated with Medicare or the government. (*Id.* at ¶ 113; Zimmerman Aff. Ex. 93 at 54:18–67:15.) If asked, Kichline clarified that Medicare Information Center was not associated with Medicare or with the government but otherwise she simply followed the script, which did not reveal that Medicare Information Center was a private company. (Zimmerman Aff. Ex. 93 at 59:11–67:15.)

In surveying physicians, Kichline asked physicians whether their offices were currently filing Medicare claims electronically. (FTC SJ Ex. 3 at Pl.'s Ex. 4.) If they were not, she then informed them of several alleged benefits of filing electronically and

---

[15] Taylor told Kichline that she would be working for Caceres and CQD. (FTC Facts ¶ 115.) However, she reported to Taylor. (Caceres Resp. ¶¶ 115, 116.)

asked if, in light of this information, the physician could "think of a specific reason why [he or she] would not choose to convert to electronic filing at this time." (*Id.*) Kichline then said, "[O]ur system is showing that there are several Medicare certified billing contractors in your area, would you like us to forward your information to one of those contractors so they can provide you with further information about the benefits of compliance?" (*Id.*) If the physician agreed to be contacted, Kichline said, "I am showing that there are contractors available through Medical Billers Network, are you familiar with the network? Medical Billers Network is a nationwide organization of home-based billing contractors. They are all Medicare certified and fully compliant with all HIPAA standards. I can have a representative contact you soon. What is a good time to catch you in the office?" (*Id.*) Kichline did not ask whether the doctors had any interest in using MBN purchasers to process their claims. (*Id.*; FTC Facts ¶ 114; Zimmerman Aff. Ex. 93 at 68:23–78:23.)

Once a purchaser completed the MBN Program training, they were provided with three "surveyed leads", *i.e.*, three local physicians' offices that had been surveyed by Kichline and had affirmatively indicated that they could be contacted by an MBN representative. (Taylor Defs.' Facts ¶ 11; Zimmerman Aff. Ex. 93 at 68:23–71:2, 108:4–117:10.) Kichline estimated that she surveyed between 23,710 and 47,420 physicians' offices, generating a total of 14,226 "surveyed leads." (Second Taylor Aff. Ex. 90.) Kichline testified during her deposition that the majority of offices she contacted indicated that they would be willing to receive a call from an MBN representative. (Taylor Defs.' Facts ¶ 7; Zimmerman Aff. Ex. 93 at 69:2–71:12.)[16]

---

[16] In a sworn declaration, however, Kichline stated that it was typically necessary to contact between five and ten offices in order to generate three surveyed leads for a purchaser. (Second Taylor Aff. Ex. 90.)

Representatives from twelve physicians' offices selected from one of Defendants' physician lists submitted declarations stating that they do not remember any phone communication from MBN. (FTC Facts ¶ 66; FTC TRO Ex. 21.) However, it is not clear from which list these offices were selected (*i.e.*, the Medicare List or the Surveyed List), nor do the declarations rule out the possibility that Kichline called the office in question but spoke to someone other than the declarant. (Taylor Defs.' Resp. ¶ 66; Taylor Defs.' Disputed Facts ¶¶ 4, 9, 15, 17–20.) Also, the survey does not even use the name MBN unless the physician indicates that he or she is willing to be contacted with more information. (FTC SJ Ex. 3 at Pl.'s Ex. 4.) Therefore, these declarations do not necessarily indicate that Defendants failed to provide purchasers with a list of surveyed physicians.

## C.    Refunds

The FTC submitted declarations from at least twelve purchasers who requested refunds from Defendants but were either refused or received no response. (FTC Facts ¶ 80.)

According to Defendants' policy, no refund would be issued to an MBN purchaser after accepting the terms of the Registration Agreement.[17] (*See, e.g.,* FTC Facts ¶ 82; Taylor Defs.' Resp. ¶ 81; Taylor Defs.' Disputed Facts ¶ 20; FTC TRO Ex. 2 Att. D; Zimmerman Aff. Ex. 94 at 169:3–18; FTC SJ Ex. 1 at 286:16–287:2.) This policy was not disclosed in the MBN sales script, but was included in the "Commonly Asked Questions" section of the sales script as a response to a purchaser's question about

---

[17] An undated letter from Caceres written around July 2003 indicates Caceres's understanding that the Registration Agreement states that the medical billing opportunity is non-refundable once accepted by the purchaser. (FTC Facts ¶ 82; FTC TRO Ex. 2 at Ex. D.)

MBN's refund policy. (FTC Facts ¶ 83, FTC SJ Ex. 2 at Pl.'s Ex. 2; Zimmerman Aff. Ex. 94 at 40:2–42:23.) The UCS sales script does disclose the refund policy, but only after the purchaser provides his or her credit card information. (FTC SJ Ex. 2 at Pl.'s Ex. 6.) Three purchasers submitted declarations indicating that Defendants did not disclose their no-refund policy to prospective purchasers before the purchasers provided credit card information to Defendants during the telemarketing call. (FTC Facts ¶ 81; FTC TRO Ex. 3 ¶ 11, Ex. 13 ¶¶ 7, 14, Ex. 23 ¶¶ 5, 8.) The Registration Agreement stated that MBN "cannot authorize any cancellations of membership following the release of final access." (Second Taylor Aff. Ex. 12.) However, the Registration Agreement was only provided to purchasers after they provided credit card information to Defendants. (FTC Facts ¶¶ 85–86, 88.)

The sales script indicates that purchasers were informed after providing credit card information that "the $199 will be billed to your credit card in the next one to four business days." (FTC SJ Ex. 2 at Pl.'s Ex. 1.) It is not clear at what point Defendants actually charged purchasers' credit cards. (*See* Taylor Defs.' Resp. ¶ 81 ("[P]rospective purchasers were required to agree to all the terms and conditions in the Purchaser Agreement prior to payment . . . ."); *but see* Aff. of Christopher Taylor, Aug. 6, 2007 ("Aug. 2007 Taylor Aff.") ¶¶ 5, 9 (stating that purchasers received "credits" or "refunds" after providing credit card information but prior to accepting the Registration Agreement)). During Taylor's deposition, he stated that he did not know when credit cards were processed but, to his knowledge, CQD processed the cards of anyone who signed up. (FTC SJ Ex. 1 at 286:4–286:15).

18

## D. Additional costs associated with the MBN Program

Purchasers of the MBN Program would have to pay an additional $100 to join a medical billing clearinghouse before they were permitted to process any claims for a physician. (FTC Facts ¶ 93.) The original telemarketing sales script used by MBN did not disclose the clearinghouse cost. (*Id.* at ¶¶ 56, 94; Zimmerman Aff. Ex. 92 at 160:5–161:1.) However, Taylor testified at his deposition that the clearinghouse fee was later made part of the sales script. (Zimmerman Aff. Ex. 92 at 160:5–161:7; 162:19–165:4.) The clearinghouse also charged a fee of 35 cents for each claim submitted by an MBN biller. (FTC Facts ¶ 96.) Taylor testified at his deposition that, at least initially, when he made telemarketing sales for MBN, he did not disclose any additional costs unless the caller asked about them. (*Id.* at ¶¶ 57, 95; Zimmerman Aff. Ex. 92 at 163:18–164:7.)

Some purchasers have submitted declarations stating that, prior to asking for payment for the program, Defendants had misrepresented or failed to disclose additional costs or requirements associated with the opportunity (FTC Facts ¶ 89);[18] additional requirements for completion of training (*id.* at ¶ 90);[19] inability to access or download

---

[18] Specifically, the purchasers state that they were not informed of costs such as the fee to obtain a medical billers license (FTC TRO Ex. 2 ¶ 12, Ex. 6 ¶¶ 11–12, Ex. 12 ¶ 12), fees for access to doctor contacts (*id.* Ex. 5 ¶ 11), a fee to be "put on the payroll" (*id.* Ex. 6 ¶¶ 9–12), fees for supplies (*id.* Ex. 12 ¶ 12 (forms), Ex. 15 ¶ 10 (medical coding manual), Ex. 20 ¶ 14 (medical coding books)), a fee to join their clearinghouse (*id.* Ex. 14 ¶ 13, Ex. 15 ¶ 10, Ex. 18 ¶ 15, Ex. 20 ¶ 14), and the clearinghouse's per claim charge for processing bills (*id.* Ex. 14 ¶ 13). (*See* FTC Facts ¶ 89.).

[19] The FTC cites two declarations in support of its claim that "Defendants misrepresented or failed to disclose . . . additional or excessive requirements in order to complete the training." (FTC Facts ¶ 90.) One declarant stated that he was unaware of the need to buy a coding manual. (FTC TRO Ex. 15 ¶ 10.) Another stated that he was "surprise[d]" and "angry" that he was required to complete two online traiuing courses when he believed that the training consisted of only one course. (*Id.* Ex. 12 ¶ 11.)

19

training materials (*id.* at ¶ 90; FTC TRO Ex. 3 ¶ 9, Ex. 8 ¶ 10, Ex. 12 ¶ 9); and inadequate or unresponsive training support (FTC Facts ¶ 91).[20]

## LEGAL STANDARDS

### I. Standard For Deciding a Motion for Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "[A]ffidavits shall be made on personal knowledge, shall set forth facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." *Id.* 56(e). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). In reviewing the record, the district court must assess the evidence in "the light most favorable to the non-moving party," resolve all ambiguities, and "draw all reasonable inferences" in its favor. *Am. Cas. Co. v. Nordic Leasing, Inc.*, 42 F.3d 725, 728 (2d Cir. 1994); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In deciding a motion for summary judgment, the court may consider, in addition to Rule 56(e) affidavits, other evidence that would be admissible at trial. *See, e.g., Universal Film Exchanges, Inc. v. Walter Reade, Inc.*, 37 F.R.D. 4, *5–6 (S.D.N.Y. 1965) ("It is the policy of Rule 56(e) to allow the affidavit to contain evidentiary matter which, if the

---

[20] In support of Defendants' failure to disclose their inadequate or unresponsive training support, the FTC offers declarations of purchasers who report not receiving receive helpful answers via email (FTC TRO Ex. 12 ¶ 9), receiving no response to questions submitted via email (*id.* Ex. 11 ¶ 7), and being unable to contact MBN by phone (*id.* Ex. 9 ¶¶ 13–14, Ex. 11 ¶ 7)). Caceres disputes that training support was inadequate, however, maintaining that "Customer service was available." (Caceres Resp. ¶ 91.)

20

affiant were in court, would be admissible as a part of his testimony.") (quoting *Am. Securit Co. v. Hamilton Glass Co.*, 254 F.2d 889, 893 (7th Cir. 1958)); *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998) ("On a summary judgment motion, the district court properly considers only evidence that would be admissible at trial.").

The moving party can satisfy its burden by showing that the opposing party is unable to establish an element essential to that party's case and on which that party would bear the burden of proof at trial. *See Celotex*, 477 U.S. at 321; *Gallo v. Prudential Servs.*, 22 F.3d 1219, 1223–24 (2d Cir. 1994) ("[T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case."). Indeed, summary judgment is "mandated" when "the evidence is insufficient to support the non-moving party's case." *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 61 (2d Cir. 1998).

If the moving party meets its burden, the "non-movant may defeat summary judgment only by producing specific facts showing that there is a genuine issue of material fact for trial." *Samuels v. Mockry*, 77 F.3d 34, 36 (2d Cir. 1996); *Celotex*, 477 U.S. at 322–23. An alleged factual dispute between the parties will not by itself defeat a motion for summary judgment, since "the requirement is that there be no genuine issue of material fact." *Liberty Lobby*, 477 U.S. at 247–48 (emphasis in original). Specifically, the non-moving party cannot rely on mere allegations, denials, conjectures, or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial. *See id.* at 256–57; *Gross v. Nat'l Broad. Co.*, 232 F. Supp. 2d 58, 67 (S.D.N.Y. 2002); *see also FTC v. Gill*, 265 F.3d 944, 954 (9th Cir. 2001) ("Once the

FTC has made a prima facie case for summary judgment, the defendant cannot rely on general denials but must demonstrate with evidence that is 'significantly probative' or more than 'merely colorable' that a genuine issue of material fact exists for trial.") (quoting *Liberty Lobby*, 477 U.S. at 249–50).

"Where cross-motions for summary judgment are filed, a court 'must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *Hotel Employees & Rest. Employees Union, Local 100 of New York, N.Y. & Vicinity, AFL CIO v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 543 (2d Cir. 2002).

## II.    Requirements of Local Rules 56.1 and 56.2

Under Local Rule 56.1 of the Local Rules of the Southern and Eastern Districts of New York, a motion for summary judgment must be accompanied by a list of numbered paragraphs specifying those "material facts as to which the moving party contends there is no genuine issue to be tried" (a "Rule 56.1 Statement"). Local Civ. R. 56.1(a). A party opposing summary judgment must then submit a response consisting of correspondingly numbered paragraphs responding to each paragraph in the moving party's Rule 56.1 Statement (a "Rule 56.1 Response"). *Id.* 56.1(b). According to Local Rule 56.1(c), "[a]ny numbered paragraph in the [Rule 56.1 Statement] . . . will be deemed admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph" in the response. *Id.* 56.1(c). Assertions in Rule 56.1 Statements and Rule 56.1 Responses must be followed by citation to admissible evidence, in accordance with Fed. R. Civ. P. 56(e). *Id.* 56.1(d).

Under Local Rule 56.2, a *pro se* litigant must receive a "Notice to *Pro Se* Litigant Opposing Summary Judgment," which specifically details the litigant's obligations in opposing the motion for summary judgment and the consequences of failure to fulfill these obligations. *Id.* 56.2. Specifically, this Rule requires that a *pro se* litigant opposing summary judgment be informed that "you may NOT oppose summary judgment simply by relying upon the allegations in your complaint" and that "if you do not respond to the motion for summary judgment on time with affidavits or documentary evidence contradicting the facts asserted by the defendant, the court may accept defendant's factual assertions as true." *Id.*

Since March 17, 2006, defendant Caceres has proceeded *pro se* in this litigation.[21] Caceres received the notice required by Local Rule 56.2. Caceres responded to the FTC's summary judgment papers by filing a "Response to Plaintiff's Rule 56.1 Statement" and a "Supplemental Response to Plaintiff's Rule 56.1 Statement," which include numbered paragraphs specifically responding to each paragraph in the FTC's Rule 56.1 Statement. Caceres did not cite to any supporting affidavits or other admissible evidence and attached only a printout of a website showing graphs of salary data for medical billers in the United States as of May 2007. This document is inadmissible hearsay to show that medical billers in fact earned these salaries.[22] Caceres also refers

---

[21] Caceres's former connsel asked to withdraw after learning that Caceres planned to argue that he sold his home in violation of this Court's Asset Freeze Order with the approval of his former counsel. *(See* Mar. 17, 2006 Tr. at 5:12–8:22, 19:5–9.)

[22] Caceres also purports to cite to data from the Department of Labor, Bureau of Labor Statistics on wages of "Medical Records and Health Information Technicians." (Caceres Resp. ¶ 47.) As discussed *infra*, there is no reason to believe that these statistics have any relevance to the expected earnings of home-based medical billers using the MBN Program.

23

once to his deposition testimony but does not provide a citation or attach the relevant portion of the transcript.

As a preliminary matter, the Court must address the question of whether it should deem all facts set forth in the FTC's Rule 56.1 Statement to be admitted for purposes of this motion because, despite having received notice of the requirements of Local Rule 56.1, Caceres failed to adhere to all of those requirements in his Response. The FTC argues that these facts should be deemed admitted because Caceres has either admitted, impliedly admitted, or failed to adequately controvert all of the FTC's asserted facts. (*See* Pl.'s Reply Mem. as to Def. Caceres ("FTC Caceres Reply") 9–10.) In particular, the FTC notes that Caceres does not cite to affidavits, deposition testimony, or any other admissible evidence in his Response. (*Id. at* 4–5.)

Despite the deficiencies in Caceres's response, he has plainly made an effort to respond to the FTC's motion, with two responsive submissions, which, while imperfect, do effectively highlight for the FTC and the Court those facts that Caceres believes to be in dispute.[23] Furthermore, allegations are not "deemed true simply by virtue of their assertion in [the] Local Rule 56.1 statement." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001). If the FTC's allegations are not accompanied by citation to admissible evidence or if the cited evidence does not support the allegation, the Court is free to disregard them. *See id.*

Given that Caceres is proceeding *pro se,* that summary judgment may only be granted where the Court is satisfied that there is no genuine issue of material fact, and

---

[23] Furthermore, while Caceres did not submit a Memorandum of Law, his "Response" and "Supplemental Response" both include Caceres's arguments responding to the FTC's brief. The Court rejects the FTC's suggestion that Caceres has, due to his failure to submit a separate document labeled as a memorandum of law, "consented to all of the FTC's legal arguments." (FTC Caceres Reply 10.)

24

that in many cases the Court can easily refer to the Taylor Defendants' submissions to locate the evidentiary support lacking in Caceres's submissions, the Court declines to accept blindly as "admitted" all factual averments made by the FTC with respect to Caceres. *See id.* (stating that a court "has broad discretion to determine whether to overlook a party's failure to comply with local court rules") (citations omitted); *see also, e.g., Melendez v. Devry Corp.,* No. 03 Civ. 1029, 2005 WL 3184277, at *1–2 (E.D.N.Y. Nov. 29, 2005) (declining to deem admitted all facts set forth in defendant's statement, where plaintiff was proceeding *pro se)*; *Berdugo v. City of New York,* No. 03 Civ. 7319, 2004 WL 1900357, at *1 (S.D.N.Y. Aug. 23, 2004) (where plaintiff failed to follow requirements of Local Rule 56.1, deeming defendants' statements of facts admitted, but only to the extent that they were supported by the record). Rather, the Court will "consider the totality of the parties' submissions in identifying disputed material facts, and will construe those disputed facts in [the non-movant's] favor as is appropriate on summary judgment." *Hamilton v. Bally of Switz.,* No. 03 Civ. 5685, 2005 U.S. Dist. LEXIS 9319, at *3–4 (S.D.N.Y. May 12, 2005); *see also Melendez,* 2005 WL 3184277, at *2 (examining "the entire record before the court, glean[ing] the material facts therefrom, and decid[ing] the motion based on those facts" despite *pro se* plaintiff's failure to comply with Local Rule 56.1(c)); *Goldman v. Admin. for Children's Servs.,* 04 Civ. 7890, 2007 WL 1552397, at *1 n.2 (S.D.N.Y. May 29, 2007) (considering the factual assertions made by *pro se* plaintiff in response to Rule 56.1 Statement, though plaintiff "did not submit any affidavits, and submitted only scant documentary evidence").

A court should interpret a *pro se* litigant's "papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir. 1994). Although Caceres's arguments may ultimately be rejected if unsupported by the law or the evidence, the Court will afford him "special solicitude" in responding to the FTC's motion for summary judgment. *Goldman,* 2007 WL 1552397, at *1 n.2. In particular, the Court will consider the best arguments suggested by Caceres's submissions and allow Caceres to benefit from the Taylor Defendants' briefs and supporting papers whenever appropriate. However, Caceres's conclusory statements that facts listed in the FTC's Rule 56.1 Statement are "incorrect," "vague," "incomplete," or "disputed" are not sufficient to put any fact in dispute when Caceres does not adequately put into dispute the FTC's underlying evidence.

CQD remains represented by counsel and has failed to submit any response to the FTC's motion for summary judgment. Therefore, the Court grants summary judgment against CQD on all counts. *See FTC v. P.M.C.S., Inc.*, 21 F. Supp. 2d 187, 189 (E.D.N.Y. 1998) ("At the very least, [defendants'] failure to participate in this litigation and oppose the FTC's motion may be viewed as constituting a concession that summary judgment is appropriate. . . .").

## III. Section 5(a) of the FTC Act

Section 5(a)(1) of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). "To prove a deceptive act or practice under § 5(a)(1), the FTC must show three elements: (1) a representation, omission, or practice, that (2) is likely to mislead consumers acting reasonably under the

26

circumstances, and (3), [that] the representation, omission, or practice is material."[24]

*FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 63 (2d Cir. 2006). "The law is violated if the first contact . . . is secured by deception . . . even though the true facts are made known to the buyer before he enters into the contract of purchase." *Exposition Press, Inc. v. FTC*, 295 F.2d 869, 873 (2d Cir. 1961). It is not required that the deception have been made in bad faith or with intent to deceive. *Verity*, 443 F.3d at 63; *FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502, 526 (S.D.N.Y. 2000).

A court should focus on the overall impression created by the advertising, not its "literal truth or falsity." *See, e.g., FTC v. Sterling Drug, Inc.*, 317 F.2d 669, 675 (2d Cir. 1963) ("It is well established that advertising need not be literally false in order to fall within the proscription of the [FTC Act]. . . . for we have increasingly come to recognize that 'Advertisements as a whole may be completely misleading although every sentence separately considered is literally true. . . .'"); *Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1496 (1st Cir. 1989) ("The impression created by the advertising, not its literal truth or falsity, is the desideratum . . . ." (quoting *Am. Home Prods. Corp. v. FTC*, 695 F.2d 681, 686 (3d Cir. 1982))); *FTC v. Peoples Credit First, LLC*, 244 Fed. Appx. 942, 944 (11th Cir. 2007) ("[T]he undisputed evidence establishes that the appellants made material representations, express or implied, that were likely to mislead reasonable

---

[24] As the Tenth Circuit has noted, "reference to the 'reasonable consumer' in the context of Section 5 may be misleading. Consumer protection laws exist to protect 'the public—that vast multitude, which includes the ignorant, the unthinking, and the credulous, who, in making purchases, do not stop to analyze, but are governed by appearances and general impressions.' 'Unlike the abiding faith which the law has in the "reasonable man," it has very little faith indeed in the intellectual acuity of the "ordinary purchaser" who is the object of the advertising campaign.' 'The average purchaser has been variously characterized as not "straight thinking," subject to "impressions," uneducated, and grossly misinformed; . . . he wishfully believes in miracles . . . .' At the same time, however, courts should remain mindful that 'the purchasing public must be credited with at least a "modicum of intelligence," a "minimum capacity for discrimination." Ordinary carelessness does not encompass extraordinary blindness.'" *FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1202 n.5 (10th Cir. 2005) (internal citations omitted).

27

consumers. The fact that the words in the mail piece are technically or literally true is not persuasive."); *FTC v. NCH, Inc.*, No. 95-16893, 1997 WL 22246, at \*2 (9th Cir. Jan. 15, 1997) ("A representation is deceptive and violates Section 5 of the [FTC Act] if its net impression is likely to mislead consumers, even if the representation is literally true."). "The failure to disclose material information may cause an advertisement to be false or deceptive even though it does not state false facts." *Katharine Gibbs School (Inc.) v. FTC*, 612 F.2d 658, 665 (2d Cir. 1979). Furthermore, "each representation must stand on its own merit, even if other representations contain accurate, non-deceptive information." *FTC v. Gill*, 71 F. Supp. 2d 1030, 1044 (C.D. Cal. 1999) (citing *Removatron*, 884 F.2d at 1496–97). The alleged misrepresentations should be evaluated "as a whole without emphasizing isolated words or phrases apart from their context." *See, e.g., Five-Star Auto Club*, 97 F. Supp. 2d at 528; *Removatron*, 884 F.2d at 1496.

"A claim is considered material if it 'involves information important to consumers and, hence, [is] likely to affect their choice of, or conduct regarding a product.'" *Five-Star Auto Club*, 97 F. Supp. 2d at 529 (quoting *Kraft, Inc. v. FTC*, 970 F.2d 311, 322 (7th Cir. 1992)). Express representations that are shown to be false are presumed material. *FTC v. Patriot Alcohol Testers, Inc.*, 798 F. Supp. 851, 856 (D. Mass. 1992).

## IV.    The Telemarketing Sales Rule

The TSR was promulgated pursuant to the Telemarketing and Consumer Fraud and Abuse Prevention Act, which directed the FTC to "prescribe rules prohibiting deceptive telemarketing acts or practices and other abusive telemarketing acts or practices." 15 U.S.C. §§ 6101 *et seq*; *see also FTC v. 1263523 Ontario, Inc.*, 205 F.

28

Supp. 2d 218, 219 (S.D.N.Y. 2002). The TSR prohibits a seller from "[m]isrepresenting, directly or by implication . . . [a]ny material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer." 16 C.F.R. § 310.3(a)(2). The TSR also requires a seller to disclose any no-refund policy "in a clear and conspicuous manner." *Id.* § 310.3(a)(1). This disclosure must be made "[b]efore a customer pays for goods or services." *Id.*

Any violation of the TSR is deemed a "deceptive act or practice" in violation of Section 5(a) of the FTC Act. 15 U.S.C. § 6102(c); 16 C.F.R. § 310.1.

## ANALYSIS

### I. Count I—Expected Income

#### A. The nature of Defendants' earnings representations

Defendants' earning representations included print advertisements representing that consumers could earn "Great Pay!" and statements during telephone sales calls that "working part-time, with one doctor, a biller processes an average of 80 to 120 claims per week. A biller makes an average of five dollars per claim, paid directly by the doctor, on a biweekly basis, $400–600 per week" (FTC SJ Ex. 2 at Pl.'s Ex. 2) and "individual results will vary based on typing speed, but an average biller can process five to fifteen claims per hour and the current industry standard is three to five dollars per claim" (*id.* Ex. 2 at Pl.'s Ex. 6). In addition, for some period of time, Defendants ran ads stating that consumers could earn $50,000 per year.

Declarations submitted by MBN purchasers and an FTC investigator also indicate that Defendants' salespeople represented that purchasers make, "could" make, "could expect" to make, or "would" make income from the program. The income

representations were both specific (*e.g.*, $500 or more per week and $400 to $600 per week) and general (*e.g.*, "a good deal of money," "a lot of money").

Defendants do not deny that their sales scripts included earnings representations but instead argue that the representations did not refer to the income that MBN purchasers were likely to earn, but to "the type of earnings that could be expected by someone working in the medical billing field," as gathered from Taylor's conversations with "working medical billers" and "medical billing experts," from statistics compiled by the U.S. Department of Labor, Bureau of Labor Statistics ("BLS statistics") regarding average wages for "Medical Records and Health Information Technicians," and from magazine articles and advertisements found online. (Taylor Defs.' Opp'n Br. 9–11; Second Taylor Aff. Ex. 61.) Of course, Taylor's alleged conversations with "medical billing experts" are rank hearsay, as are the online magazine articles and advertisements. Assuming the BLS statistics can be considered by the Court,[25] it borders on the fanciful to contend that these statistics, which report the income of a broad category of "Medical Records and Health Information Technicians," including full-time employees working for hospitals, nursing care facilities, government entities and insurance companies, provide a

---

[25] Federal Rule of Evidence 803(8) states that "records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report . . . unless the sources of information or other circumstances indicate lack of trustworthiness" are not excluded by the hearsay rule. Fed. R. Evid. 803(8). No foundational testimony is required in order to admit evidence under this hearsay exception. *See U.S. v. Doyle*, 130 F.3d 523, 546 (2d Cir. 1997). "In order to fit within the purview of Rule 803(8)(C), the evidence must (1) contain factual findings, and (2) be based upon an investigation made pursuant to legal authority. Once a party has shown that a set of factual findings satisfies the minimum requirements of Rule 803(8)(C), the admissibility of such factual findings is presumed. The burden to show 'a lack of trustworthiness' then shifts to the party opposing admission." *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 143 (2d Cir. 2000). The BLS statistics appear on their face to be factual findings made pursuant to legal authority. The FTC has objected to the BLS statistics as hearsay, but has made no attempt to show that these statistics are untrustworthy. (FTC Resp. ¶ 1.)

rational basis for estimating the earnings of freelance home billers using programs similar to the MBN Program.

The Court finds, moreover, that the actual impression created by Defendants' various earnings representations was that a typical purchaser earned "great pay"—$400 to $600 per month—and "could earn" as much as $50,000 per year *with the MBN Program*. This is especially true of the earnings representation in the "Commonly Asked Questions" section of the MBN sales script, which Taylor testified is used as a response to a consumer who asks "How much money can I make doing this?" (Zimmerman Aff. Ex. 94 at 41:11–42:23.) No consumer would have interpreted Defendants' earnings representations as pertaining to the average income of "Medical Records and Health Information Technicians" reported in BLS statistics. These representations, made in the context of MBN advertisements and telemarketing calls, would obviously have been assumed to refer to the income a purchaser would earn using the MBN Program. *See, e.g., FTC v. Febre*, No. 94 C 3625, 1996 WL 396117, at *2 (N.D. Ill. July 3, 1996) (finding, with respect to representations that a purchaser "could earn" specified amounts and that it was "possible" to make this amount, that "it can be presumed that a consumer would reasonably believe that [these statements] represent typical or average earnings"); *FTC v. Medicor LLC*, 217 F. Supp. 2d 1048, 1053–1054 (C.D. Cal. 2002) (finding that even if earnings representations were qualified with the statement "results may vary," consumers could reasonably believe that the statements of earnings potential represented typical or average earnings).

The Taylor Defendants also argue that their earnings representations did not constitute a Section 5(a) violation because they were "not false . . . but true." (Taylor

Defs.' Opp'n Br. 4.) Of course, Defendants proffer no admissible evidence indicating that their representations were true. In any event, a representation may be misleading in violation of Section 5(a) even if it is literally true. *See, e.g., Sterling Drug*, 317 F.2d at 675 ("It is well established that advertising need not be literally false in order to fall within the proscription of the [FTC Act]."). Therefore, Defendants' argument can only succeed if the *impression* created by the representation is true. The Taylor Defendants argue that the representation that "an average biller can process 5 to 15 claims per hour" is true because even a below average typist would be physically capable of entering far more than the necessary 200 to 600 keystrokes necessary to process this number of claims. (Taylor Defs.' Opp'n Br. 13–15.) This argument does not help Defendants. No consumer would interpret this statement to mean that a medical biller is physically capable of entering 5 to 15 claims per hour. The obvious implication of the statement in the context of a telemarketing call is not only that an average medical biller is capable of processing 5 to 15 claims per hour, but also that he *receives* a sufficient number of claims to process claims at this rate, and could reasonably expect to process this number of claims. The prospective purchaser was interested in the amount of money he could earn from the MBN Program and would interpret this statement in context as being relevant to expected income, not to the non-limiting factor of typing ability. To the extent this information was understood to refer to the potential purchaser's typing speed, it could only be misleading, as it would imply that a purchaser's potential earnings are limited only by the purchaser's typing speed, rather than the number of claims referred to the purchaser by physicians. Indeed, Defendants promoted such an interpretation in the MBN sales script, which states, "We recommend starting out part time with one doctor

32

until you are confident with your processing speed. Once you know how many claims per hour you can process you can increase your workload accordingly." (FTC SJ Ex. 2 at Pl.'s Ex. 6.)

The Taylor Defendants' argument that the Registration Agreement did not contain any misleading earnings representations is irrelevant. (Taylor Defs.' Opp'n Br. 7–8.) The alleged misrepresentations were made in print advertisements and during telephone sales calls, not in the Registration Agreement. Even if the representations in the Registration Agreement are accurate, these would not somehow cure misrepresentations that had already been made. *See, e.g., Exposition Press*, 295 F.2d at 873 ("The law is violated if the first contact is secured by deception even though the true facts are made known to the buyer before he enters into the contract of purchase."); *FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006) ("A solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures.").

## B. Actual earnings of MBN purchasers

Misrepresentations regarding expected income from a business opportunity are material. *See Five-Star Auto Club*, 97 F. Supp. 2d at 529 ("The case law is clear that representations regarding the profit potential of a business opportunity are important to consumers, and therefore such are material misrepresentations in violation of Section 5."); *FTC v. Minuteman Press*, 53 F. Supp. 2d 248, 258 (E.D.N.Y. 1998) ("Such misrepresentations—which tend to bear directly on the economic viability of the transaction under consideration—are both likely to deceive and material."). Therefore, if

Defendants' representations regarding earnings were false or misleading, they violated Section 5(a) of the FTC Act.

However, neither the FTC nor the Taylor Defendants are entitled to summary judgment on Count I because there are disputed issues of material fact regarding the actual earnings of MBN purchasers.

In support of its motion for summary judgment, the FTC submitted twenty affidavits of MBN purchasers who did not bill any claims or earn any money using the program. (FTC Facts ¶ 51; FTC TRO Exs. 2–20, Ex. 23.) However, as Defendants point out, only two of these declarants completed the MBN training and attempted to contact physicians. (Taylor Defs.' Opp'n Br. 21–39.) One reported that she tried to contact over one hundred physicians from the Medicare List but found none willing to hire her as a medical biller. (FTC TRO Ex. 20 ¶ 12.) The other had a similar story, reporting that she contacted twenty to thirty doctors from the Surveyed List without success. (*Id.* Ex. 23 ¶ 7.) The remaining declarations, from purchasers who never attempted to become medical billers, shed no light on the actual earnings that purchasers could or did achieve using the MBN Program.[26]

---

[26] In an October 22, 2007 letter to the Court, the FTC requested permission to supplement the record with a sworn declaration from Karen Knicely (the "Knicely Declaration"), the Vice President and Chief Financial Officer of Electronic Translations and Transmittals Corporation ("ET&T"), the medical billing clearinghouse to which MBN purchasers were referred. (Knicely Decl. ¶ 6; Zimmerman Aff. Ex. 92 at 159:13–17.)

According to the FTC, the Knicely Declaration was not submitted as part of its original summary judgment papers because the FTC became aware of the potential relevance of Ms. Knicely's testimony only after Defendants' belated production of correspondence between ET&T and MBN regarding the low success rates and inadequate knowledge of medical billers referred by MBN. In subsequent correspondence to the Court, Defendants do not deny that this correspondence was not timely produced to the FTC, but nevertheless object to the FTC's request to supplement the record, claiming that Defendants have been denied the opportunity to respond to the Knicely Declaration. The FTC indicated that it would not object to Defendants' submission of an affidavit in response to the Knicely Declaration, but Defendants never requested leave to file any such response. Defendants did respond to the Knicely Declaration, however, both in a October 23, 2007 letter to the Court and at oral argument. The Court finds that

34

Defendants likewise submitted declarations of four MBN purchasers who claim to

have earned money as medical billers using the MBN Program. The average income

reported in these declarations, interpreted in the most favorable light for Defendants, is

approximately \$830 per month.[27] (Second Taylor Aff. Ex. 30.)

---

Defendants are not prejudiced by the Court's consideration of the Knicely Declaration and grants the FTC's request to supplement the record.

In her declaration, Ms. Knicely states that ET&T employees reported that they received "frequent and time-consuming inquiries from MBN's customers," whose "basic questions demonstrate[ed] that they lacked the requisite knowledge and training to process a medical bill and were receiving inadequate software support from MBN." (Knicely Decl. ¶ 19.) In February 2004, based on ET&T's records and consultations with staff, Knicely determined that, in fifteen months, only twelve MBN purchasers had enrolled with ET&T, and only four had submitted a claim. (*Id.* at ¶¶ 20–21.) Knicely further states that "ET&T staff . . . repeatedly informed Taylor of the extremely low success rate of MBN's customers." (*Id.* at ¶ 24.) Knicely eventually terminated the relationship with MBN and refused to accept any new MBN customers due to continued problems with MBN purchasers. (*Id.* at ¶ 27.) Knicely states that she consulted ET&T's database containing yearly claims data for MBN purchasers and determined that, during the entire course of the relationship between MBN and ET&T (from October 2002 until March 2005), only twenty-eight MBN purchasers submitted claims to ET&T, that the MBN customers were, as a group, "very minimal billers with the great majority unable to submit more than a few hundred claims per year," and that most "were only enrolled with ET&T for six months or less and had only one doctor account, which ET&T has found insufficient to become a successful medical biller." (*See id.* at ¶ 31.)

Attached to the Knicely Declaration are the data on which Knicely's statements regarding the success of MBN purchasers are based—a spreadsheet summarizing the number of claims filed by MBN purchasers who enrolled with ET&T from 2002 through 2007. (*See id.* Att. D.) At oral argument, the FTC sought to rely on these data as evidence that Defendants' earnings representations were false. Defendants do not deny that this information is accurate but correctly object that this portion of the Knicely Declaration is based on inadmissible hearsay.

Knicely's testimony about the number of claims submitted by MBN purchasers is based on her review of yearly claims data in the ET&T database. (*Id.* at ¶ 31.) The Court cannot consider the information from the database under the "business records" hearsay exception provided by Federal Rule of Evidence 803(6) because the FTC has not submitted the necessary foundation testimony. *See* Fed. R. Evid. 803(6) (requiring "testimony of the custodian or other qualified witness [or certification under Rules 902(11) or 902(12)]" showing that evidence is "[a] memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, [] kept in the course of a regularly conducted business activity, and [that] it was the regular practice of that business activity to make the memorandum, report, record or data compilation.") The Court notes, however, that data regarding the number of claims submitted by MBN purchasers to the only clearinghouse to which MBN purchasers were directed (at least until March 2005), if admissible, would likely resolve any disputed issue of fact regarding whether Defendants' earnings representations were false and/or misleading. If the FTC wishes to renew its motion with respect to Defendants' earnings representations at a later time, supported by the ET&T data and a supplemental affidavit providing the foundation testimony required by Rule 803(6), the Court may revisit its decision on this issue at such time.

[27] Resolving ambiguities in favor of Defendants, the Court has calculated this average using the larger amount reported by those declarants who reported an earnings range. This average includes the earnings of one declarant who reported an income of between \$800 and \$2400 per week.

In other cases in which courts have granted summary judgment of Section 5(a) violations for misleading earnings representations, the evidence submitted by both parties established beyond dispute that typical actual earnings were far less than the earnings represented. By contrast, in this case, the present record includes only a handful of selected declarations from purchasers, some which support Defendants' earnings representations and some which do not. Neither party provides any evidence indicating that its declarations are typical or representative of MBN purchasers.

In *Federal Trade Commission v. Patriot Alcohol Testers*, 798 F. Supp. 851 (D. Mass. 1992), the District of Massachusetts district court granted summary judgment that the defendants had violated Section 5(a) by representing to consumers that the average income generated by its product was $130 per week. 798 F. Supp. at 855–56. Both the defendants and the FTC submitted affidavits from purchasers reporting the amount of income the purchaser earned from the product. *Id.* at 856. The affidavits submitted by defendants, even interpreted in the most favorable light to defendants, reported an average income of $49 per week per device. *Id.* This average would have been considerably lower if the FTC's affidavits, all of which reported earnings of twenty dollars or less per week, had been included. *Id.* The court found that because of the wide disparity between the earnings representations and the evidence of earnings in the record, "the only conclusion a reasonable finder of fact could reach is that the representations were false and likely to mislead consumers acting reasonably under the circumstances. *Id.*

In *Federal Trade Commission v. Medicor*, 217 F. Supp. 2d 1048 (C.D. Cal. 2002), the Central District of California district court granted summary judgment against

defendant based on its deceptive representations regarding earnings. Like MBN, defendant Medicor sold medical billing software.[28] 217 F. Supp. 2d at 1054. Medicor made representations that purchasers could earn $20 to $40 per hour, $300 to $600 per week, and $20,000 to $45,000 per year. *Id.* The FTC presented unconverted evidence that, of the 40,420 consumers who purchased Medicor's medical billing software, only 64 ever processed claims, for a total of 2,641 claims. *Id.* This evidence, the court found, "indicates that the vast majority of consumers did not earn the amount represented as the earning potential." *Id.*

In *Federal Trade Commission v. Stefanchik*, No. C04-1852RSM, 2007 WL 1058579 (W.D. Wash. April 3, 2007), the Western District of Washington district court granted the FTC's motion for summary judgment, where defendant's representations that purchasers could earn "large amounts of money in their spare time" were found to be "false and unsubstantiated earnings claims," as demonstrated, in part, by a consumer survey conducted by the FTC's expert witness. 2007 WL 1058579, at *5–6.

In light of the evidence submitted in *Medicor*, which involved the sale of a similar program, it appears unlikely that the average income of MBN purchasers is consistent with Defendants' representations. *See Medicor*, 217 F. Supp. 2d at 1054 (describing uncontroverted evidence that only 64 of over 40,000 purchasers of medical billing software processed even one medical claim.) However, there is insufficient evidence in this record for the Court to find that there is no genuine issue of material fact regarding the falsity of Defendants' earnings representations. *See supra* pp. 33–36 and note 26. Accordingly, each party's motion for summary judgment on Count I is denied.

---

[28] The FTC notes that Defendant Taylor previously worked as a telemarketer for Medicor, the defendant in *Medicor*. (Pl.'s Reply Mem. as to Taylor Defs. ("FTC Taylor Reply") 18; Zimmerman Aff. Ex. 92 at 31:24–33:1.)

## II.    Physician Information

The FTC alleges that Defendants represented that they would give purchasers access to information regarding "physicians who were likely to use the purchasers to process the physicians' medical claims," while in fact these physicians "knew nothing of Defendants and had no use for these purchasers' services." (FTC Br. 11.)

The MBN sales script represented that "Medicare has just provided us a list of over 150,000 doctors who are still filing their insurance claims on paper. We are in the process of converting these doctors to electronic filing so they will be in compliance with the new Medicare requirements." (FTC Facts ¶ 58; FTC SJ Ex. 2 at 29:5–31:21, Ex. 2 at Pl.'s Ex. 1.) As a whole, these representations in the sales script, especially in the context of MBN's representation that it was a "network," created the impression that some of the doctors on the Medicare List had already decided to convert to electronic filing and that MBN had some existing relationship with these doctors and was actively working with them as part of some ongoing conversion "process."

In fact, the undisputed evidence indicates that the doctors had not decided to convert to electronic filing or even expressed an interest in doing so. At best, some of the subset of doctors that had been contacted by Susan Kichline (who falsely identified herself as associated with the "Medicare Information Center") had stated, based on the information Kichline provided, that they could not think of a reason why they would not switch to electronic filing and were willing to receive more information. (*See, e.g.,* FTC SJ Ex. 3 at Pl.'s Ex.4; Zimmerman Aff. Ex. 93 at 68:23–71:23.) This is a far cry from being "in the process" of conversion to electronic billing. Furthermore, it is undisputed that MBN had no relationship with these doctors. Though Kichline claims to have

38

surveyed between 23,710 and 47,420 physicians on the Medicare list in order to provide purchasers who have completed their MBN Program training with three physician "leads" (*see, e.g.,* Second Taylor Aff. Ex. 90; Zimmerman Aff. Ex. 93 at 45:20–46:21, 108:4–117:10), she asked these physicians only if they would be willing to receive more information about the "benefits of compliance." (FTC SJ Ex. 3 at Pl.'s Ex. 4.) When physicians agreed to be contacted with more information, Kichline informed them that MBN was a network of home-based billing contractors and that an MBN contractor would be in touch with them. She did not ask for or obtain any commitment from these physicians to work with MBN in any capacity. Therefore, in no sense was MBN "in the process of converting" the physicians on the Medicare List to electronic filing.

Taylor stated that the representation that MBN was "in the process of converting these doctors [on the Medicare list] to electronic filing" referred to the fact that the ultimate goal of MBN's training program and phone surveys was to "aid[] [the] nationwide conversion . . . to electronic filing." (Taylor Defs.' Disputed Facts ¶ 84; Taylor Defs.' Facts ¶ 34; Zimmerman Aff. Ex. 92 at 89:3–90:24.) While it is true that MBN purchasers were trained to convert doctors to electronic filing and that a handful were even in the process of doing so, Defendants' sales script used the word "we," not "our purchasers." Whatever Defendants' undisclosed intentions were, the sales pitch clearly would have given a reasonable consumer the impression that it was MBN—not MBN purchasers—who were "in the process" of converting doctors to electronic filing. Even assuming *arguendo* that the representation is literally true if "we" is interpreted to include MBN purchasers, literal truth is not the standard for determining whether a violation of Section 5(a) has occurred. *See, e.g., Sterling Drug*, 317 F.2d at 675 ("It is

39

well established that advertising need not be literally false in order to fall within the proscription of the [FTC Act]. . . . for we have increasingly come to recognize that 'Advertisements as a whole may be completely misleading although every sentence separately considered is literally true. . . .'"); *see also Resort Car Rental Sys., Inc. v. FTC,* 518 F.2d 962, 964 (9th Cir. 1975) ("Advertising capable of being interpreted in a misleading way should be construed against the advertiser.").

In fact, Defendants had no relationship with these doctors and were not helping them to convert to electronic filing. To the contrary, it was the purchasers of the MBN Program who had to attempt to convert these physicians to electronic filing, a fact about which some purchasers claim to have been affirmatively misled.[29] "[E]vidence that some customers actually misunderstood the thrust of the message is significant support for the finding of a tendency to mislead." *Beneficial Corp. v. FTC,* 542 F.2d 611, 617 (3d Cir.

---

[29] *See, e.g.,* FTC TRO Ex. 2 ¶ 7 ("The representative also implied that MBN had relationships with doctors' offices to receive medical bills."), Ex. 3 ¶ 7 ("The representative added that MBN would refer me to doctors in my area who would use my services to process their medical bills."), Ex. 4 ¶ 13 ("It was also my understanding that MBN would find my first physician client which they did not do."), Ex. 5 ¶ 6 ("[T]he [MBN] representative told me that once I passed the test and was referred to doctors who were in need of my services, my only responsibility would be to pick up the work at the doctors' offices and mail it back upon completion."), Ex. 6 ¶ 8 ("I was also supposed to get access . . . to a list of doctors interested in employing people like me to process their medical bills."), Ex. 7 ¶ 6 ("[The representative] said that [MBN] had connections to the local doctors on this list and . . . assurred [sic] me that there was available work in my local area."), Ex. 7 ¶ 7 ("I expected to do well based on the impression that the representative gave me that my new medical billings [sic] skills were highly needed by the local doctors."), Ex. 10 ¶ 5 ("The impression I got from the [MBN] representative was that they would provide me with the names of doctors that were ready, willing, and able to retain me to provide medical billing services—these would be doctors who had been contacted directly by [MBN] and that when I contacted these doctors they would know I was [an MBN] trained billing processor."), Ex. 14 ¶ 7 ("The representative also said that MBN knew of doctors in my area who needed medical billing services, doctors who were waiting for me to start working for them."), Ex. 14 ¶ 14 ("I learned that MBN would not set me up with a doctor's office for billing, but would only provide me with a list of doctor's offices, which I would then be expected to solicit on my own. This contradicted my prior impression—rooted in my initial telephone conversation with MBN's representative—that MBN would actively help place me with a doctor(s) in my area."), Ex. 15 ¶ 7 ("After my conversation with Ms. Jane Kelly I felt reassured that upon completing the training, MBN's marketing team would contact me and introduce me to doctors . . . who were known by MBN and who needed to hire me as a representative of MBN to process claims on their behalf."), Ex. 23 ¶ 5 ("I was also informed . . . that the doctors I would be working for were members of MBN. . . .").

40

1976); *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029–30 (7th Cir. 1988) (same).

Defendants' representations also created the impression that physicians were required to file Medicare claims electronically. In his deposition, Taylor explained that the representation that doctors who converted to electronic filing would in doing so become "complian[t] with Medicare requirements" referred to the fact that Medicare "wants" doctors to submit claims electronically, has tried to pass laws to this effect, and has "done everything in their power to . . . force physicians to convert . . . to electronic filing." (Zimmerman Aff. Ex. 92 at 91:4–96:7.)

Taylor further testified at his deposition that the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") made electronic filing mandatory but that the deadline for compliance has been pushed back each year. (FTC Facts ¶¶ 60–61; Taylor Defs.' Disputed Facts ¶¶ 89, 90; Zimmerman Aff. Ex. 92 at 87:12–88:8.) However, Defendants offer no evidence that supports their assertion that HIPAA has required or will require electronic filing of Medicare bills at any time. (Zimmerman Aff. Ex. 92 at 87:12–88:17, 91:4–17, 93:10–18, 96:1–7.) The provisions of HIPAA cited by Defendants only provide for the *standardization* of electronic filing for those physicians who choose to file claims electronically—they do not indicate that physicians are required or will ever be required to file claims electronically.[30] (Second Taylor Aff. Ex. 43 (quoting excerpts from Health Insurance Portability and Accountability Act of 1996, Pub. L. 104-191, §§ 261, 262, 110 Stat. 1936, 2021–31 (1996) (codified at 42 U.S.C.

---

[30] Taylor indicated at his deposition that the claim that physicians who "converted" to electronic filing would be "in compliance with new Medicare requirements" referred only to the fact that MBN's software was compliant with these HIPAA standards, not that electronic filing of Medicare claims was required. (Zimmerman Aff. Ex. 92 at 91:4–97:4.)

41

§§ 1320d–1320d-8)); Taylor Defs.' Disputed Facts ¶ 85; Zimmerman Aff. Ex. 92 at 87:3–88:17, 91:18–92:6.)

Defendants' misrepresentations about their relationship with the doctors on the Medicare list were obviously material. The belief that Defendants were already working with a large number of doctors who were in the process of converting to electronic billing to become "compliant" with non-existent Medicare requirements would have significantly reduced the perceived risk of the purchase. The ease with which a purchaser would be able to connect with a doctor's office willing to use the purchaser's services obviously would influence the consumer's decision whether or not to purchase the MBN program. *See, e.g., Five-Star Auto Club, Inc.*, 97 F. Supp. 2d at 529 ("A claim is considered material if it 'involves information important to consumers and, hence, [is] likely to affect their choice of, or conduct regarding a product.'").

Finally, contrary to Defendants' arguments (*see, e.g.*, Taylor Defs.' Opp'n Br. 18– 19), the disclosure regarding the MBN Program in the Registration Agreement is irrelevant to whether the representations made during telephone sales calls were deceptive and/or misleading.[31] *See, e.g., Exposition Press*, 295 F.2d at 873 ("The law is

---

[31] Defendants rely on the following section of the Registration Agreement in support of their argument that their representations regarding physician leads were not misleading (*see* Taylor Defs.' Opp'n Br. 18 n.11):

> #4. I understand that MEDICAL BILLERS NETWORK is not an employment agency, nor do I work directly for MEDICAL BILLERS NETWORK. I understand that as a member I am entitled access to online databases of physicians who have been identified by Medicare as filing their claims on paper, as well as extensive marketing tools and information to help me secure contracts with those physicians. I acknowledge that completing the training is my responsibility and upon completion of the training I am entitled to assistance from MEDICAL BILLERS NETWORK in locating doctors who can benefit from my services. I understand and accept that MEDICAL BILLERS NETWORK cannot guarantee my success and that my success as a medical biller is ultimately dependent on my own ability to complete the training, perform the work correctly and present and conduct myself professionally.

(Second Taylor Aff. Ex. 12.)

42

violated if the first contact is secured by deception, even though the true facts are made known to the buyer before he enters into the contract of purchase."); *Gill,* 71 F. Supp. 2d at 1044 ("[E]ach representation must stand on its own merit, even if other representations contain accurate, non-deceptive information.") (citing *Removatron,* 884 F.2d at 1496–97).

## III. Misrepresentations regarding "Material Aspects" of the MBN Program

In addition to the prohibition under Section 5 of the FTC Act of "deceptive acts or practices," the TSR independently makes unlawful the "misrepresent[ation], directly or by implication, in the sale of goods or services . . . [of] [a]ny material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer." 16 C.F.R. § 310.3(a)(2)(iii). The FTC asserts that Defendants violated this provision by (1) failing to disclose additional costs associated with becoming a medical biller; and (2) failing to disclose additional requirements to complete the medical billing training. (FTC Br. 13.)[32]

---

[32] The FTC also asserts TSR violations based on Defendants' misrepresentations (1) that MBN purchasers are likely to earn a substantial income, and (2) that MBN will provide purchasers with information about physicians who are likely to use the purchasers' medical billing services. The Court has already addressed these alleged misrepresentations in connection with Counts I and II of the FTC's Complaint, respectively. For the same reasons discussed *supra* with respect to whether these representations constituted "deceptive acts or practices" under Section 5 of the FTC Act, the Court holds that (1) neither party is entitled to summary judgment on the issue of whether Defendants' earnings representations constitute a violation of the TSR, and (2) the FTC is entitled to summary judgment that Defendants' representations regarding physician contacts constitute a violation of the TSR.

In its reply brief, the FTC attempts to raise two additional representations it alleges violate § 310.3(a)(2)(iii) of the TSR: representations regarding the availability of training materials and representations regarding the adequacy and responsiveness of MBN's customer snpport. (Pl.'s Reply Br. 11–12.) These claims were raised for the first time in the FTC's reply brief. To avoid prejudice to Defendants, who have had no opportunity to respond, the Court will not consider these additional purported grounds supporting Count III. *See, e.g., In re Dobbs,* 227 Fed. Appx. 63, 64 (2d Cir. 2007) ("[W]e think that it was entirely proper for the District Court to decline to consider debtor-appellant's argument, raised for the first time in its reply brief"); *Playboy Enters., Inc. v. Dumas,* 960 F. Supp. 710, 720 n.7 (S.D.N.Y. 1997) ("Arguments made for the first time in a reply brief need not be considered by a court."). In any case, though Defendants did represent in the MBN sales script that purchasers would have access to free

43

The Taylor Defendants argue that the FTC's claims that Defendants violated the TSR by failing to disclose additional costs and requirements associated with the MBN Program are subject to Rule 9(b) of the Federal Rules of Civil Procedure. (*See* Taylor Defs.' Reply Br. 1–2, 8, 17 n.30.) Rule 9(b) requires a plaintiff asserting a claim for fraud or mistake to plead the circumstances constituting such fraud or mistake with particularity. Fed. R. Civ. P. 9(b). Count III of the FTC's Amended Complaint does not specifically include any allegation regarding a TSR violation based on Defendants' failure to disclose additional costs and requirements. These issues are raised in the FTC's moving papers. The Taylor Defendants argue that Rule 9(b) does not permit the FTC to now assert such nondisclosures as grounds for a TSR violation. (*See* Taylor Defs.' Reply Br. 1–2, 8, 17 n.30.) As the Taylor Defendants raise this argument for the first time in their reply brief and the FTC has had no opportunity to address it, the Court declines to consider it. *See, e.g., In re Dobbs*, 227 Fed. Appx. 63, 64 (2d Cir. 2007) ("[W]e think that it was entirely proper for the District Court to decline to consider debtor-appellant's argument, raised for the first time in its reply brief"); *Playboy Enters., Inc. v. Dumas*, 960 F. Supp. 710, 720 n.7 (S.D.N.Y. 1997) ("Arguments made for the first time in a reply brief need not be considered by a court."). In any case, the argument is likely without

---

training materials and free online technical support (FTC SJ Ex. 2 at Pl.'s Ex. 1), Defendants would likely be entitled to summary judgment on the FTC's claims that these representations violated the TSR, given the meager record before the Court. The evidence supporting the claim that Defendant misrepresented the accessibility of its training materials consists of the declarations of three purchasers who had problems accessing or downloading the MBN training materials and one who did not receive a disk necessary to complete the training. (FTC Facts ¶ 90.) The evidence supporting the claim that Defendant misrepresented the quality of its online technical support consists of the declaration of one purchaser who received no response to two emails sent to MBN customer support and the declaration of another who received responses but found them "not helpful." (*Id.* at ¶ 91.) "Confronted with a properly supported summary judgment motion, a plaintiff must come forward with evidence sufficient to allow a reasonable jury to find in his favor." *See, e.g., Lizardo v. Denny's, Inc.*, 270 F.3d 94, 101 (2d Cir. 2001). Neither of the FTC's new Count III grounds is supported by evidence from which a reasonable jury could conclude that the unavailability of training materials or inadequacy of technical support was so common or typical as to constitute a "material aspect of the performance, efficacy, nature, or central characteristics" of the MBN Program. 16 C.F.R. § 310.3(a)(2)(iii).

merit. Defendants do not argue that they have suffered any prejudice because they lacked notice of the specific additional grounds the FTC now asserts in support of its Count III. Nor do Defendants explain why the pleading requirements of Rule 9(b) should apply to this action. Other district courts have held that actions brought by the FTC for violations of Section 5(a) of the FTC Act are not subject to Rule 9(b). *See FTC v. Communidyne, Inc.*, No. 93 C 6043, 1993 WL 558754, at *2 (N.D. Ill. Dec. 3, 1993) (holding that a claim under Section 5(a) is not a claim of fraud or mistake subject to Rule 9(b) because it has no scienter or reliance requirement.); *FTC v. Skybiz.com, Inc.*, No. 01-CV-396-K(E), 2001 WL 1673649, at *4 (N.D. Okla. Aug. 2, 2001) (holding that Rule 9(b) does not apply to Section 5(a) claim); *FTC v. Nat'l Testing Servs., LLC*, No. 3:05-0613, 2005 WL 2000634, at *2 (M.D. Tenn. Aug. 18, 2005) (holding that Rule 9(b) does not apply to Section 5(a) claims because neither intent to deceive, proof of consumer reliance, nor proof of consumer injury are necessary elements).

## A. Misrepresentations regarding additional costs

It is undisputed that an MBN purchaser was required to pay a fee of approximately $100 to a medical billing clearinghouse before the purchaser would be allowed to submit bills to that clearinghouse for processing. (FTC Facts ¶ 93; *see* Zimmerman Aff. Ex. 92 at 158:17–160:5.) The original MBN sales script did not contain any language disclosing this $100 fee. (FTC Facts ¶ 94; *see* Zimmerman Aff. Ex. 92 at 160:15–161:8.) At some later time, a disclosure about the clearinghouse fee was added to the sales script. (*See* Zimmerman Aff. Ex. 92 at 160:15–161:8.) However, Taylor testified that, at least initially, if a customer did not ask about additional costs, he was not

informed about the clearinghouse fee. (FTC Facts ¶ 95; *See* Zimmerman Aff. Ex. 92 at 163:18–164:7.)

Following the MBN sales script, Defendants' sales representatives told customers, "All you have to do is join [MBN] and agree to process your claims through our network clearinghouse. There is a one-time programming fee of $199 that covers your setup with [MBN] and includes free software, free training as well as free technical support on line." (FTC SJ Ex. 2 at Pl.'s Ex. 1.) The use of the phrase "our network clearinghouse" created the impression that MBN also operated the clearinghouse to which purchasers would submit their claims.[33] Because Defendants represented that the clearinghouse was part of the MBN "network," the representation that purchasers paid a "one-time programming fee . . . that covers your setup with [MBN]" implied to a reasonable consumer that this "one-time" fee covered any "setup" fee associated with the clearinghouse as well.

Payment of the clearinghouse fee is necessary if a purchaser wants to begin earning money as a medical biller. An additional $100 fee connected with a $199 purchase is clearly a "material aspect of the performance, efficacy, nature, or central characteristics" of the MBN Program. 16 C.F.R. § 310.3(a)(2)(iii). The FTC is entitled to summary judgment that Defendants' representations regarding the "one-time" fee were "deceptive telemarketing acts or practices" in violation of the TSR.[34]

---

[33] This representation was apparently false; Taylor testified at his deposition that MBN worked with the ET&T clearinghouse. (Zimmerman Aff. Ex. 92 at 159:13–17.)

[34] The FTC also cites three declarations of purchasers complaining of other "hidden costs" for "forms" (FTC TRO Ex. 12 ¶ 12) and medical coding manuals (*id.* Ex. 15 ¶ 10, Ex. 20 ¶ 14). There are disputed issues of fact as to whether any of Defendants' representations (such as the representation that there was a "one-time programming fee of $199") implied that purchasers would have no costs for supplies. (FTC SJ Ex. 2 at Pl.'s Ex. 1.) Defendants' representation that the "one-time programming fee" covered "free training" implies that the purchaser will not have to purchase additional manuals in order to complete the training. (*Id.*) However, it is not clear from the declarations whether these medical coding manuals were actually required to complete the training or whether the declarants bought them on their own initiative as a

46

## B. Additional Requirements to Complete Training

The FTC also asserts that Defendants violated the TSR by failing to disclose "additional requirements to complete the medical billing training." The only relevant evidence cited by the FTC in support of this claim is the declaration of a single purchaser who complained that the online training required him to pass two online tests when he expected only one. (FTC TRO Ex. 12 ¶ 11.) This purchaser does not indicate that Defendants' sales representatives made any representations to him regarding training requirements. The FTC has not identified any express or implied representation made by Defendants regarding the requirements associated with the MBN Program training. Therefore, Defendants are entitled to summary judgment on the FTC's claim that Defendants violated the TSR by misrepresenting "additional requirements to complete the medical billing training."

## IV. Refund Policy

In Count IV, the FTC alleges that Defendants violated § 310.3(a)(1)(iii) of the TSR, which requires a covered seller or telemarketer to disclose a seller's no-refund policy "in a clear and conspicuous manner." 16 C.F.R. § 310.3(a)(1)(iii). This disclosure must be made "before a customer pays for goods or services offered." *Id.*

It is undisputed that MBN had a no-refund policy that went into effect once the purchaser accepted the Registration Agreement. (*See, e.g.,* Taylor Defs.' Facts ¶¶ 33–34; Aug. 2007 Taylor Aff. ¶ 9.) The Registration Agreement stated that, because there was

---

supplement to the MBN training. There are therefore disputed issues of fact as to whether Defendants misrepresented that there would be no costs to the purchaser for additional coding manuals. On the present record, neither party is entitled to summary judgment on the FTC's claims for TSR violations based on Defendants' representations regarding allegedly "hidden costs" associated with forms and coding manuals.

no way for CQD and MBN to confirm that all copies of the software and training materials had been returned, CQD and MBN could not "authorize any cancellations of membership following the release of final access." (*See* Second Taylor Aff. Ex. 12.) Defendants concede that MBN's no-refund policy was not disclosed before purchasers' credit card information was taken. (Taylor Defs.' Opp'n Br. 40 at n.13.) Because the FTC does not argue otherwise, the Court will assume that Defendants did not charge purchasers' credit cards until after they logged on to the MBN website and accepted the terms of the Registration Agreement.[35]

The FTC argues that, even if purchasers' credit cards were not charged until they accepted the Registration Agreement, Defendants nevertheless violated the TSR by failing to disclose that they had a no-refund policy prior to taking purchasers' credit card information. Under the FTC's interpretation of the TSR, a purchaser "pays for goods or services" in a credit card transaction when he gives the vendor his credit card information. (FTC Br. 13–14.) Defendant disputes this interpretation, arguing that payment occurs, at the earliest, when the transaction is processed and the vendor submits the charge to the credit card issuer. (Taylor Defs.' Br. 42–43; Taylor Defs.' Reply Br. 14–15 n.26.)

---

[35] It is unclear when Defendants actually charged purchasers' credit cards. While Defendants assert that "the evidence plainly demonstrates [that] . . . payment wasn't finalized until registration was complete" (Taylor Defs.' Opp'n Br. 42–43) and that "only when the customer acknowledged having read the agreement . . . and had accepted all the terms, was there payment by the consumer" (*id.* at 40 & n.13), the Court is aware of no evidentiary support for this statement, which is in fact directly contradicted by Defendants' argument that purchasers could and did receive refunds prior to acceptance of the Registration Agreement (*see, e.g.,* Aug. 2007 Taylor Aff. ¶ 5 (stating that there were "many instances in which customers have 'paid' CQD for the MBN Product by tendering a credit card" then later, before accepting the Registration Agreement, "cancelled the deal" and received an "immediate credit" or "refund")). Taylor stated in his deposition that he did not know at what point CQD processed purchasers' credit cards but that "to [his] knowledge, they processed everybody that signed up." (FTC SJ Ex. 1 at 286:4–15.) However, Taylor also indicates that he "set up the MBN website" so that purchasers had to accept the terms of the Registration Agreement before they "completed their purchase of and paid for the MBN product." (First Taylor Aff. ¶ 41.)

48

The FTC's argument relies on the Statement of Basis and Purpose for the TSR, which directly addresses this issue. *Telemarketing Sales Rule, Statement of Basis and Purpose and Final Rule*, 60 Fed. Reg. 43842, 43846 (Aug. 23, 1995). Two commenters to the FTC's proposed rule asked whether "'payment' occur[s] when the customer provides a seller or telemarketer with his or her credit card information, or when the customer's credit card account is charged for the goods or services?" *Id.* The FTC responded by stating that it "intends that the disclosures be made *before* the consumer sends funds to a seller or telemarketer or divulges to a telemarketer or seller credit card or bank account information. Thus, a telemarketer or seller who fails to provide the disclosures until the consumer's payment information is in hand violates the Rule." *Id.* (emphasis in original).

Defendant argues that the Court cannot consider the clarification provided by the FTC in the Statement of Basis and Purpose because the language of the regulation is not ambiguous—a customer "pays" when she "satisfie[s] her obligation to the vendor". (Taylor Defs. Reply Br. 14–15.)

The Court finds that, in the context of a credit card transaction, a customer "pays" when he provides his credit card information and authorizes the vendor to charge it. According to the MBN sales script, Defendants' telemarketers, after taking a purchaser's credit card information, informed the purchaser that "the $199 will be billed to your credit card in the next one to four business days." (FTC SJ Ex. 2 at Pl.'s Ex. 1.) The sales script includes nothing indicating that a purchaser needed to take any further action in order to authorize Defendants to bill the purchaser's credit card for the MBN Program. The MBN sales script clearly created the impression that a purchaser had authorized

Defendants to bill his or her credit card for the MBN Program upon providing Defendants with credit card information. Therefore, the purchaser "paid" for the MBN program by providing credit card information during the sales call.

Alternatively, even if the phrase were found to be ambiguous, the Court would adopt the FTC's interpretation of this language. An agency's interpretation of its own regulations is entitled to great deference. *See, e.g., Udall v. Tallman*, 380 U.S. 1, 16–17 (1965) ("[A] court must necessarily look to the administrative construction of the regulation if the meaning of the words used is in doubt. . . . The ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation.") (quoting *Bowles v. Seminole Rock Co.*, 325 U.S. 410, 413–14 (1945)); *see also Central Tex. Tel. Co-op., Inc. v. FCC*, 402 F.3d 205, 213 (D.C. Cir. 2005) ("'[T]he courts and the public may use [Statements of Basis and Purpose] in the interpretation of the agency's rules.'") (quoting Attorney General's Manual on the Administrative Procedure Act 32 (1947)).

The Taylor Defendants next argue that MBN did not violate § 310.3(a)(1) of the TSR because the telemarketer CQD permitted refunds and MBN disclosed its no-refund policy in the Registration Agreement. This argument is a nonstarter. MBN is a "seller" as defined by the TSR.[36] CQD is a "telemarketer" as defined by the TSR.[37] The TSR prohibits a seller or telemarketer from failing to tell the customer before payment that the

---

[36] A seller is defined as "any [individual, group, unincorporated association, limited or general partnership, corporation, or other business entity] who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration." 16 C.F.R. § 310.2(o),(r). Taylor acknowledges that MBN is a "seller" according to this definition. (Aug. 2007 Taylor Aff. ¶ 2.)

[37] A telemarketer is defined as "any [individual, group, unincorporated association, limited or general partnership, corporation, or other business entity] who, in connection with telemarketing, initiates or receives telephone calls to or from a customer." 16 C.F.R. § 310.2(o),(t). Taylor acknowledges that CQD is a "telemarketer" according to this definition. (Aug. 2007 Taylor Aff. ¶ 2.)

seller has a policy of not providing refunds. CQD telemarketed for the seller MBN and did not disclose MBN's no-refund policy.

Defendants also argue that the failure to disclose MBN's no-refund policy did not violate the TSR because the policy did not go into effect until the purchaser accepted the Registration Agreement and acknowledged that he had understood and agreed to its terms. (Taylor Defs.' Reply Br. 15–16.) Therefore, by the time there was a no-refund policy, the required disclosure had been made. This characterization of Defendants' refund policy does not alter the Court's analysis. The TSR states unambiguously that if a seller has a no-refund policy, it must be disclosed prior to payment. The TSR does not distinguish between policies that are triggered immediately and those that go into effect at some later time or upon acceptance of additional terms. It is undisputed that Defendants had a no-refund policy: a purchaser who accessed the MBN software and/or training materials was not entitled to a refund if he was unsatisfied with his purchase. Defendants violated the TSR by failing to disclose this policy prior to payment.

The Taylor Defendants also seek to avoid liability for the inadequate disclosure of MBN's refund policy by pointing out that MBN (as opposed to CQD) did no telemarketing, took no credit card information, and accepted no payment. (Aug. 2007 Taylor Aff. ¶¶ 2, 9.) Under § 310.3(4)(b) of the TSR, it is a "deceptive telemarketing act or practice" and a TSR violation for an entity to knowingly "provide substantial assistance or support" to a seller or telemarketer that is engaged in a violation of §§ 310.3(a), (c), or § 310.4. *See* 16 C.F.R. § 310.3(4)(b). MBN knowingly provided substantial assistance to CQD's violations by developing and supplying the sales script

51

that violated the TSR. Therefore, MBN also engaged in "deceptive telemarketing act[s] or practice[s]" in violation of the TSR.

To sum up, the FTC is entitled to summary judgment that Defendants have violated the TSR, and therefore section 5(a) of the FTC Act, by misrepresenting the nature of the doctor contacts provided to MBN purchasers, misrepresenting that purchasers would not be required to pay a clearinghouse an additional fee to process their claims, and failing to disclose MBN's no-refund policy before the customer paid for the MBN Program.

## V.  Liability

The FTC contends that both MBN and CQD should be held liable for the representations in the MBN sales script, even though CQD, as the telemarketer for MBN, was the entity that actually made representations to consumers. The FTC further argues that Taylor should be held liable for the actions of MBN and that Caceres should be held liable for the actions of CQD.

### A.  Liability of MBN for the acts and representations of CQD

Sometime after September 2002, CQD took over the telemarketing of the MBN Program and was the entity that actually made the representations and omissions at issue in this action. (*See, e.g.,* FTC Facts ¶¶ 97–98; FTC SJ Ex. 1 at 263:4–264:18.) However, "[t]he law is clear that under the FTC Act, a principal is liable for misrepresentations made by his/her agents (i.e., those with the actual or apparent authority to make such representations) regardless of the unsuccessful efforts of the principal to prevent such

misrepresentations."[38] *Five-Star Auto Club*, 97 F. Supp. 2d at 527; *see also Goodman v. FTC*, 244 F.2d 584, 592 (9th Cir. 1957) ("[T]he courts take the view that the principal is bound by the acts of the salesperson he chooses to employ, if within the actual or apparent scope of his authority, even when unauthorized."). Moreover, MBN may be liable for representations made by CQD even if, as Defendants claim, CQD was acting as an "independent contractor." (*See* Taylor Defs.' Resp. ¶ 99); *see, e.g., Five-Star Auto Club*, 97 F. Supp. 2d at 527 (holding that defendants were liable for misrepresentations made by marketing directors even if these individuals would be considered independent contractors by law); *Stefanchik*, 2007 WL 1058579, at \*22 ("It is well settled that a principal is liable under the FTC Act for misrepresentations by its agents, even if those agents do not fall within the traditional definition of agency."); *Goodman*, 244 F.2d at 592 ("[R]egardless of the manner in which these salespersons may have been designated in contracts between them and the petitioner or were carried on his books, so far as the public was concerned, they were his authorized agents and acted not only within the apparent but also within the actual scope of their authority."). It is clear that CQD had actual and apparent authority to make representations on behalf of MBN. (*See, e.g.,* FTC Facts ¶¶ 97–98; FTC SJ Ex. 1 at 264:4–266:2.) For example, Taylor created the sales script and provided it to CQD (*see, e.g.,* FTC Facts ¶¶ 22, 44, 55; Taylor Defs.' Disputed Facts ¶¶ 67, 93–96, 98, 100–102; Second Taylor Aff. Ex. 63), required CQD and its sales representatives to comply with his "policies" (Zimmerman Aff. Ex. 92 at 128:11–131:14), and recommended that all sales representatives follow the sales script "word for word" (FTC Facts ¶ 55; Taylor Defs.' Disputed Facts ¶¶ 22, 93–96, 98, 100, 102; Second

---

[38] Here, because all of the representations on which liability is based were part of the MBN sales script, any attempts by MBN to prevent CQD salespeople from making misrepresentations is not at issue.

53

Taylor Aff. Ex. 63). *See Stefanchik*, 2007 WL 1058579, at *18–19, 21–22 (finding that marketing company acted as agent of defendant based on agreement to market defendant's services, defendant's receipt of a percentage of gross revenue, and defendant's authority to "review and approve . . . telemarketing scripts" and direct mail pieces and to determine what products were sold). The sales script indicated that the salesperson was calling from MBN, not CQD. (FTC SJ Ex. 2 at Pl.'s Ex. 1); *see Five-Star Auto Club*, 97 F. Supp. 2d at 527 (noting that it would be "inappropriate" for a defendant to hold out salespeople as its representatives and to "'reap the fruits from their acts and doings without incurring such liabilities as attach thereto.'"). In addition, most of the purchaser declarations submitted by the FTC indicate that the purchaser believed he or she was speaking with a representative of MBN. (*See, e.g.,* FTC TRO Ex. 2 ¶ 5, Ex. 3 ¶ 3, Ex. 5 ¶ 5, Ex. 7 ¶ 9, Ex. 8 ¶ 7, Ex. 9 ¶ 6, Ex. 10 ¶ 5, Ex. 11 ¶ 5, Ex. 12 ¶ 7, Ex. 14 ¶ 5, Ex. 16 ¶ 6, Ex. 20 ¶ 6.) Therefore, MBN is also liable for Section 5(a) violations resulting from representations made by CQD as the telemarketer of the MBN Program.

## B. Liability of Taylor and Caceres for acts of MBN and CQD

Individual defendants may be liable for corporate acts or practices if they (1) participated in the acts or had authority to control the corporate defendant and (2) knew of the acts or practices. *FTC v. Crescent Publ'g Group, Inc.*, 129 F. Supp. 2d 311, 324 (S.D.N.Y. 2001); *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 574 (7th Cir. 1989).

"Authority to control the company can be evidenced by active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer." *Amy Travel*, 875 F.2d at 573–74; *see also Consumer Sales Corp. v. FTC,* 198 F.2d 404, 407–08 (2d Cir. 1952), *cert. denied,* 344 U.S. 912 (1953) (holding

that individual officer-directors of defendant corporation were properly included in FTC cease and desist order, citing fact that these individuals "directed and guided the corporation in matters of policy.").

The knowledge requirement is satisfied by "actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth." *Amy Travel*, 875 F.2d at 574. An individual's degree of participation in business affairs is probative of knowledge. *Id.* at 573–74. "[T]he FTC is not required to show that a defendant *intended* to defraud consumers in order to hold that individual personally liable." *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997).

Because of the knowledge requirement for individual liability, a defendant's good-faith belief in the truth of a representation, while not relevant to the question of whether the representation violates the FTC Act, may be relevant to whether that defendant can be held individually liable for these misrepresentations. *See Patriot Alcohol Testers*, 798 F. Supp. at 860 n.3 ("Although . . . Prall's purported good-faith belief about the validity of the representations concerning insurance discounts is not material in determining whether such representations violate [Section 5(a) of the FTC Act], it is material in determining whether he can be held personally liable for such representations.").

The requirements for individual liability are clearly met in this case with respect to Taylor. Taylor is the president, chief executive officer, sole director, and sole shareholder of MBN. (FTC Facts ¶¶ 4, 12, 14, 15; Taylor Defs.' Disputed Facts ¶ 21.) He was the "designer and draftsman" of the MBN program and the materials used by

MBN to market the program to the public, including the sales script on which all of Defendants' section 5(a) violations are based. (*See, e.g.,* FTC Facts ¶¶ 44, 55, 104–108; Taylor Defs.' Disputed Facts ¶¶ 22, 44.) He required CQD and all sales representatives to sign a compliance agreement requiring them to represent the product according to his "policies." (Taylor Defs.' Disputed Facts ¶¶ 93, 95; Zimmerman Aff. Ex. 92 at 128:11– 131:14.) He structured the marketing and registration for the MBN program so that purchasers were not provided with the Registration Agreement, which contained additional disclosures about the nature of the MBN Program as well as its refund policy, until after they had provided credit card information to Defendants based on the representations made in the MBN sales script. (*See, e.g.,* FTC Facts ¶¶ 83, 86; Taylor Defs.' Disputed Facts ¶¶ 44, 46, 66, 68.) He placed advertisements and telemarketed on behalf of MBN. (FTC Facts ¶¶ 17, 43.) Taylor knew of the representations made to consumers during telemarketing calls and knew (1) that the doctors on the Medicare List had not agreed to convert to electronic filing, (2) that Defendants did not have an existing relationship with these doctors and were not "in the process of converting" them to electronic filing, (3) that Medicare did not in fact require doctors to file claims electronically, (4) that there was an additional clearinghouse registration fee of approximately $100 that was not disclosed for some portion of MBN's operation, and (5) that MBN had a no-refund policy that was not disclosed to purchasers by the time they provided credit card information and agreed to be charged. As such, Taylor had authority to control MBN, participated in some of the deceptive acts and practices at issue, and had knowledge of all of them. The Court grants summary judgment as to the individual liability of Taylor for the actions of MBN.

Taylor argues that he did not have knowledge of any misrepresentations, as he believed that the representations in the sales script were "true," "reasonably based," and "carefully researched." (Taylor Defs.' Reply Br. 18.) To the extent Taylor is arguing that he had a good-faith belief in the truth of the representations, he is merely asserting a belief in his own interpretation of the representations, an interpretation that differs from the impression these representations conveyed to the reasonable consumer. For example, the Taylor Defendants cite their assertion that the doctors on the Medicare List were in fact likely to hire an electronic biller because "doctors do indeed use electronic billers." (*Id.*) However, Defendants did not represent that, in general, doctors use electronic billers, but that the doctors on the Medicare list were affiliated in some way with MBN and were in the process of converting to electronic billing. Taylor did not, and could not have had, a good-faith belief in this representation, because he knew that it was not accurate.

Finally, the Taylor Defendants repeatedly point out that Taylor designed the marketing of the MBN Program, including the sales script and compliance guidelines, to comport with applicable FTC laws. (*See, e.g.,* Taylor Defs.' Disputed Facts ¶¶ 8, 10, 22, 34–36, 42–46, 67, 86.) Taylor specifically refers to an excerpt from a court order allegedly issued in *Federal Trade Commission v. Medicor*, which directed Medicor to alter its sales script to include specific verbiage. (*See* Second Taylor Aff. Ex. 65.) Taylor claims to have "extrapolated" some of this verbiage for use in the MBN sales script. (Taylor Defs.' Disputed Facts ¶ 86; Second Taylor Aff. Ex. 65; Zimmerman Aff. Ex. 92 at 99:3–101:16.)[39] Indeed, Taylor previously worked as a telemarketer for Medicor, an

---

[39] Taylor asserts that the MBN sales script disclosure, "individual results will vary based on typing speed but an average biller can process 5–15 claims per hour," was based on the sales script language ordered by

57

organization that sold similar home medical billing opportunities and was found to have engaged in multiple violations of the FTC Act for similar misrepresentations to those at issue in this action, *see Medicor*, 217 F. Supp. 2d at 1053–54, he testified that he "was never really clear on" the reasons why Medicor had been sued by the FTC. (Zimmerman Aff. Ex. 92 at 99:12–100:6.) Leaving aside Mr. Taylor's *bona fides*, it is sufficient to point out that because Taylor's assessment regarding the legality of the MBN marketing was wrong, this argument is unavailing. *Cf. Cyberspace.com LLC*, 453 F.3d at 1202 ("'[R]eliance on advice of counsel [is] not a valid defense on the question of knowledge' required for individual liability." (quoting *Amy Travel,* 875 F.2d at 575)).

With respect to the individual liability of Caceres, the undisputed evidence indicates that, as the president, secretary, treasurer, sole director, and principal owner of CQD, Caceres had authority to control CQD, at least until early 2005. (Caceres Resp. ¶ 20; FTC TRO Ex. 1 Att. B 7–8.) Undisputed evidence also indicates that Caceres had knowledge of the falsity of the representations regarding the doctor contacts provided by MBN and regarding MBN's no-refund policy. *(See, e.g.,* FTC Facts ¶ 82; Caceres Resp.

---

the court in *Medicor*. (Taylor Defs.' Disputed Facts ¶ 86.) The full text of the relevant excerpt from the document to which Taylor refers is as follows:

> It is further ordered that the following shall replace paragraphs 3 and 4 in [M]edicor['s] current sales script . . . :

> "We will provide you with the software, all the training, training materials, a database of prospective doctors to contact for potential claims processing employment, as well as unlimited technical and marketing support to help you get started right away. Individual results may vary, but it is possible to process five to fifteen claims per hour, depending on your typing speed. [T]his allows you to be part of a lucrative industry. You understand that [M]edicor will provide training, but your actual success is based on your individual efforts. *Doctor solicitation is required.* The list of doctors is obtained from [M]edicare and identifies doctors who do not currently bill electronically. The list is current as of 'date.'"

(Second Taylor Aff. Ex. 65 (emphasis added).) Interestingly, Taylor did not incorporate into the MBN sales script the disclosure that doctor solicitation would be required.

¶¶ 81–82.) For example, the FTC cites a letter from around July 2003 written by Caceres to Citibank in opposition to a purchaser's attempt to dispute his charge for the MBN program. (FTC TRO Ex. 2 at Ex. D.) The letter indicates Caceres's knowledge of the nature of the doctor contacts provided by MBN. Caceres disputes the purchaser's misunderstanding that MBN would "provid[e] doctors" for purchasers, arguing that the Registration Agreement "clearly states . . . the service we provide"—the purchaser is entitled to "a database of physicians who have been identified by Medicare as filing their claims on paper."[40] (FTC TRO Ex. 2 ¶¶ 15–17, Ex. 2 at Exs. A, D.) In the letter, Caceres further argues that the Registration Agreement "clearly states" that the purchase of the MBN Program was non-refundable once the Membership Agreement was accepted. (FTC TRO Ex. 2 ¶¶ 15–17, Ex. 2 at Exs. C, D.) Caceres also testified at his deposition that "we tried to stick with" MBN's policy of not providing refunds after acceptance of the Registration Agreement, indicating that Caceres knew of the existence of the policy. (Zimmerman Aff. Ex. 94 at 169:3–171:16.) The FTC is entitled to summary judgment on the issue of Caceres's individual liability relating to the misrepresentations regarding doctor contacts and the post-payment disclosure of MBN's no-refund policy.

The FTC has not directed the Court's attention to any evidence indicating that Caceres knew of the additional fee required for a purchaser to submit claims to MBN's clearinghouse. While "[t]he degree of participation in business affairs is probative of knowledge," *Amy Travel*, 875 F.2d at 573–74, and Caceres, by his own admission, "was constantly thinking about how to improve the program" (Caceres Resp. ¶ 101; Caceres

---

[40] In the letter, Caceres wrote, "As for his claim of us providing doctors for him, 'again' the enclosed membership clearly states 'your [sic] entitled to a database of physicians who have been identified by Medicare as filing their claims on paper." (FTC TRO Ex. 2 at Ex. D.)

Supp'l Resp. 6–7), the FTC has not cited to evidence indicating that Caceres was involved in this aspect of the business. The FTC is therefore not entitled to summary judgment on the issue of Caceres's individual liability for Defendants' representations regarding these additional costs.

## C.    Injunctive relief

In its summary judgment papers, the FTC requests the entry of a permanent injunction and monetary damages pursuant to Section 13(b) of the FTC Act. 15 U.S.C. § 53(b). Section 13(b) states that "in proper cases the [FTC] may seek, and after proper proof, the court may issue a permanent injunction."

The FTC has demonstrated that a permanent injunction is warranted against Defendants. Section 13(b) permits a court to issue a permanent injunction for the violation of any law enforced by the FTC. *See, e.g., Minuteman Press*, 53 F. Supp. 2d at 260; *FTC v. Evans Prods. Co.,* 775 F.2d 1084, 1086–87 (9th Cir. 1985). "Permanent injunctive relief is appropriate when there is a 'some cognizable danger of recurring violation.'" *Medicor*, 217 F. Supp. 2d at 1057; *see also Minuteman Press*, 53 F. Supp. 2d at 260 ("A permanent injunction may properly issue in those situations involving a 'cognizable danger of recurrent violation[s]'" (quoting *United States v. W.T. Grant Co.,* 345 U.S. 629, 633 (1953))). Some factors to consider in determining whether such a danger exists include:  the defendants' scienter, whether the conduct was isolated or recurrent, whether defendants are positioned to commit future violations, the degree of consumer harm caused by defendants, defendants' recognition of their culpability, and the sincerity of defendants' assurances (if any) against future violations. *Minuteman Press*, 53 F. Supp. 2d at 260–61. As discussed above, Defendants knowingly made

misrepresentations to consumers for years and a large number of consumers purchased the MBN program based on these misrepresentations. Defendants do not recognize their culpability, but continue to insist that their representations were true, ignoring the obvious impressions that they actually conveyed to consumers. Under these circumstances, a permanent injunction is warranted.

However, because the FTC's claims against Defendants have not been completely resolved on summary judgment, the scope of the permanent injunction that will ultimately issue is as yet undetermined and entry would be premature at this time. Once all liability issues are resolved, the Court will enter an appropriate injunction directed towards the deceptive acts and/or practices for which Defendants have been found liable.

### D.    Monetary Damages

Section 13(b) of the FTC Act has been interpreted as granting a court the authority to order a defendant to pay restitution as ancillary relief to effectuate a permanent injunction. *See, e.g., FTC v. Febre*, 128 F.3d 530, 534 (7th Cir. 1997) ("The power to grant ancillary relief includes the power to order repayment of money for consumer redress as restitution or recession."); *see also FTC v. Verity Int'l Ltd.*, 443 F.3d 48, 66 (2d Cir. 2006) (noting that Fifth, Seventh, Eighth, Ninth, and Eleventh circuits had concluded that § 13(b) permitted restitution or other ancillary equitable relief); *FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1203 n.6 (10th Cir. 2005) ("Although § 13(b) does not expressly authorize a court to grant consumer redress (i.e., refund, restitution, rescission, or other equitable monetary relief), § 13(b)'s grant of authority to provide injunctive relief carries with it the full range of equitable remedies, including the power to grant consumer redress."); *Five-Star Auto Club*, 97 F. Supp. 2d at 533 ("This grant of

permanent injunctive power gives the court broad equitable authority to 'grant any ancillary relief necessary to accomplish complete justice.'").

Because the Court has held that a permanent injunction is warranted in the instant case, restitution may also be available. However, while consumer reliance need not be established in order to issue a permanent injunction, the FTC must make such a showing before a court may order restitution under § 13(b). *Freecom Commc'ns*, 401 F.3d at 1205. The FTC satisfies its burden, however, by showing that "(1) the business entity made material misrepresentations likely to deceive consumers, (2) those misrepresentations were widely disseminated, and (3) consumers purchased the entity's products."[41] *Id.* at 1206. As discussed above, Defendants made material misrepresentations that were misleading to a reasonable consumer. These misrepresentations, all of which were part of the MBN sales script, were widely disseminated, and led to an estimated 20,000 sales.

In the Second Circuit, "[t]he appropriate measure for restitution is the benefit unjustly received by the defendants." *Verity*, 443 F.3d at 67. Under the circumstances presented, in which Defendants sold directly to consumers and no non-party middleman received any part of the payment, the Defendants' "unjust gains" are equivalent to the consumers' loss. *Id.* at 67–68 ("[I]n many cases in which the FTC seeks restitution, the defendant's gain will be equal to the consumer's loss because the consumer buys goods or services directly from the defendant."). It is initially the FTC's burden to provide a

---

[41] As discussed above, the FTC has established that Taylor can be held individually liable for any consumer redress ordered as relief for the violations on which summary judgment has been entered against Defendants, and that Caceres can be held individually liable for consumer redress for the misrepresentations regarding doctor contacts and the failure to disclose MBN's no-refund policy prior to payment.

reasonable approximation of this amount. *Id.* at 67. If the FTC "show[s] that its calculations reasonably approximated the amount of the defendant's unjust gains . . . 'the burden shifts to the defendants to show that those figures were inaccurate.'" *Id.* (quoting *Febre*, 128 F.3d at 535).

What constitutes a "reasonable approximation" of unjust gains may vary depending on the information available to the FTC. *See id.* at 69 ("Of course, the reasonableness of an approximation varies with the degree of precision possible."). While "the risk of uncertainty should fall on the wrongdoer whose illegal conduct created the uncertainty," the FTC should use available resources to obtain and make use of relevant information in constructing its estimate. *See id.* at 69–70 (vacating district court's monetary award of district court that "required no precision even though precision could be had" in light of the "FTC's investigatory power"); *see also FTC v. Oks*, No. 05 C 5389, 2007 WL 3307009, at *6 (N.D. Ill. Nov. 2, 2007) (denying motion for summary judgment with respect to monetary relief for Section 5(a) violation where "the FTC has failed to provide sufficient information with regard to the calculation of the monetary relief sought.").

The FTC proposes that Defendants be held jointly and severally liable for a restitution award of $4,000,000, a calculation based on 20,000 sales of the MBN product at $199 each for the period from the time CQD took over telemarketing for MBN[42] until February 10, 2005, when the Complaint in this action was filed ("the CQD Period"). (FTC Br. 23.) The FTC also seeks $294,380 from Taylor and MBN for income earned from MBN program sales in 2001–2002, prior to the creation of CQD. (*Id.* at 24.)

---

[42] According to Taylor's deposition testimony, Caceres created CQD and took over telemarketing for MBN sometime after August or September 2002. (FTC SJ Ex. 1 at 263:4–264:18.)

63

Finally, the FTC seeks recovery of any income earned by Defendants from sales made between February 10, 2005 and December 6, 2005, the period during which the parties have stipulated that Defendants made sales in contempt of the Court's March 18, 2005 Stipulated Preliminary Injunction Order ("the Contempt Period"). (*Id.*) The FTC acknowledges that the amount of damages assessed for sales made during the Contempt Period will need to be determined at a hearing. (*Id.* at 24 n.11.)

The FTC estimates Defendants' earnings from sales of the MBN Program during the CQD Period based on Taylor's deposition testimony stating that "about 20,000 units of the MBN products" were sold at prices of $199, $219, and $299 per unit since CQD took over the telemarketing for MBN. (FTC Facts ¶ 117; FTC SJ Ex. 1 at 283:21– 284:22.) Defendants do not dispute the FTC's assertion that 20,000 sales were made at a price of between $199 and $299. (*See, e.g.,* Caceres Resp. ¶ 117, Taylor Defs.' Resp. ¶ 117.) Assuming 20,000 sales were made during the CQD Period at $199, $219, and $299 per sale, consumers paid between $3,980,000 and $5,980,000 to defendants during this period. Since Defendants apparently concede that these sales were made at these prices, the Court finds that the FTC has demonstrated that consumer loss totaled at least $3,980,000 (less any refunds paid during this period), and that this constitutes a reasonable approximation of Defendants' unjust gains during the CQD Period.[43]

The FTC asserts that is entitled to recover $294,380 from Taylor and MBN for income earned from sales of the MBN Program that occurred before Caceres and CQD

---

[43] Defendants assert that, despite MBN's no-refund policy, approximately $160,000 in refunds were issued (Taylor Defs.' Reply Br. 13, 17; Caceres Resp. ¶ 81) and Caceres maintains that he cut all ties with CQD and left the medical billing industry in early 2005 (Caceres Resp. 2–3, ¶ 25). The Court is aware of no evidence in the current record to indicate the amount that was refunded to purchasers by Defendants or any evidence indicating that Caceres severed his relationship with CQD at any time. If Defendants wish to pursue these arguments, they must reassert them with proper evidentiary support at the appropriate time.

took over telemarketing for MBN. (FTC Br. 24.) The FTC appears to have based this figure on Taylor's Financial Disclosure Statement, which indicates that he earned $32,800 in 2001 and $261,580 in 2002 from MBN. (FTC Facts ¶¶ 119, 123; FTC SJ Ex. 9.) The Court is aware of no evidence in the record indicating precisely when the CQD Period began. Taylor's deposition testimony suggests that Caceres took over telemarketing for MBN sometime after August or September of 2002. (FTC SJ Ex. 1 at 263:4–264:18.) A damages judgment of $3,980,000 from Defendants for the CQD Period and $294,380 from Taylor for 2001 and 2002 sales of the MBN Program would potentially constitute double recovery. The Court therefore finds that the FTC has not provided a reasonable approximation of Taylor and MBN's unjust gains from sales prior to the CQD Period. *See Oks*, 2007 WL 3307009, at *6 ("The FTC must clarify which amount it seeks (for what time period) and specify precisely how that amount is calculated with proper evidentiary support for that specific time period.").

Though the Court finds that the FTC has provided a reasonable approximation of Defendants' unjust gains during the CQD Period, summary judgment with respect to a fixed amount of damages would be premature at this time in light of the necessity for further proceedings regarding Defendants' liability for Counts I and III, the calculation of damages for sales before and after the CQD Period, and the calculation of any refunds issued by Defendants. The Court will address damages issues more comprehensively at a later date. At such time, Defendants will have an opportunity to present evidence demonstrating that the FTC's approximations of Defendants' unjust gains are inaccurate.

## CONCLUSION

The FTC's motion for summary judgment **[40]** is granted in part and denied in part. The Taylor Defendants' motion for summary judgment **[53]** is granted in part and denied in part.

SO ORDERED.

Dated: New York, New York
March 31, 2008

Richard J. Holwell
United States District Judge